RALPH NEELY AND VIRGINIA G. NEELY, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 24184–81, 26934–82.     Filed December 17, 1985.

*Reid E. Robison* and *Kenneth L. Buettner*, for the petitioners.

*Juandell D. Glass*, for the respondent.

OPINION

CLAPP, *Judge*: Respondent determined deficiencies in, and additions to, petitioners' Federal income tax as follows:

| Docket No. | Year | Deficiency | Sec. 6653(a)[1] addition to tax |
|---|---|---|---|
| 24184–81 | 1976 | $182,606.00 | $9,130 |
| | 1977 | 54,592.00 | 2,730 |
| | 1978 | 370,210.00 | 18,511 |
| 26934–82 | 1979 | 166,678.50 | 8,334 |
| | 1980 | 38,944.00 | 1,947 |

The issues for decision are: (1) The amount deductible for charitable contributions of African art to qualified organizations in all years in issue; (2) whether respondent properly assessed an addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations regarding petitioners' claimed values for the contributed art; (3) whether fees paid in 1977 and 1978 in connection with petitioners' art collection were properly deductible; (4) whether office furniture transferred to petitioner Ralph Neely (Neely) was taxable income or a nontaxable gift; (5) whether legal fees paid in 1977 and 1978 in relation to stock owned by petitioner Virginia Neely (Mrs. Neely) were properly deductible against ordinary income or should have been added to basis; and (6) whether respondent's motion to amend his answers should be granted, and if so, whether the imposition of section 6621(d) increased interest raised in the amendments is appropriate. For convenience, our findings of fact and opinion are combined.

Some of the facts, and the exhibits pertaining thereto, are stipulated and are so found. Petitioners Ralph Neely and Virginia G. Neely are husband and wife, who, at the time they filed their petition, resided in Reno, Nevada. They filed their tax returns for the years in issue with the Internal Revenue Service in Ogden, Utah.

Petitioner Ralph Neely graduated from the University of Texas with a bachelor of science degree in business in 1936 and later earned a graduate degree in business and investment

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 effective for the tax year or years in issue.

management. He held several jobs while working his way through his undergraduate and graduate studies. One of these positions, which continued after graduation, was with the State of Texas Insurance Department. He later joined an insurance brokerage firm in Oklahoma City, Oklahoma. During World War II, Neely became an officer in the U.S. Naval Reserve and served 4 years of active duty. Subsequently, he re-entered the insurance brokerage business. In 1959, he joined a business which later became the Doric Corp. (Doric). By 1973, he was president, chairman of the board of directors, and chief executive officer, which positions he held until 1976. In April 1975, Doric was merged into a subsidiary (Esmark) of Esmark, Inc. In 1976, Neely exercised an option in his employment agreement to become a consultant to the firm. That same year, the Doric offices in Oklahoma City were closed and its operations transferred to the Chicago headquarters of Esmark.

Petitioner Virginia Neely graduated from Vassar College, and later continued her education by taking various art courses. Some of these were at the University of Oklahoma and were sponsored by the Oklahoma Art Museum. During World War II, Mrs. Neely worked with a steamship line in San Francisco, California, assisting in cargo and troop movements. She later returned to Oklahoma City, where she worked for a brief period as a medical lab technician. She has also been a housewife and is the mother of five children. Mrs. Neely has pursued her interest in art by studying ceramics of both Chinese and American origin, antique furniture of the French, English, and Early American styles, and oriental rugs. Through her pursuits she has acquired an interest in, and an aptitude for, interior design.

In addition to these other forms of art, Mrs. Neely also became attracted to African art. The term "African art" embraces sculpture crafted by native artisans and usually takes the form of masks or icons of the types used in tribal rituals. In 1968, Neely, aware of his wife's interest, gave her a Christmas present of a piece of African art which she had admired. Gradually, petitioners added pieces to their collection. Initial acquisitions were made from Ben Pickard (Pickard), a dealer in Oklahoma City. In 1972, petitioners made the acquaintance of Thomas L. McNemar (McNemar) while he was in Oklahoma City for the purpose of discussing African art

with Pickard. By that time, petitioners had resolved to amass a very large personal collection of African art, and they purchased 118 pieces from McNemar in the period 1972 to 1974 for a total price of $161,267. McNemar sold the art to petitioners at his cost plus a 10- to 20-percent markup. Petitioners did not examine the art prior to the purchases.

Mrs. Neely, in 1973, formed Vaney, Ltd. (Vaney), an Oklahoma closely held corporation, of which she was the sole shareholder. Later that year, Vaney entered into a joint venture agreement with Ben Pickard, Inc., creating the partnership Pickard Art Galleries, Ltd. (PAG). The stated purpose of the partnership was to operate an art gallery. Ben Pickard was the original manager of the gallery. He purchased for the gallery substantial amounts of African art from McNemar. McNemar decided what pieces would be shipped to the gallery, and he determined the prices he would be paid for these items. Although Pickard did not negotiate the prices the gallery paid for the pieces, he had authority to accept or reject any of the shipments. In the course of purchasing more than 1,200 pieces from McNemar, Pickard made no rejections. PAG held a public auction in Dallas, Texas in June 1975, at which it offered more than 200 pieces of the African árt. None of the items sold.

PAG, in financing its purchases of art, became primarily liable on promissory notes aggregating $250,000 to Liberty National Bank & Trust Co. of Oklahoma City (Liberty). Petitioners were guarantors on these notes. In addition to the guaranty, Liberty had obtained a security interest in the art and certain other assets of PAG. PAG defaulted on the debt and although the bank had a right to call upon the guaranty without first foreclosing upon the collateral, it elected to do the latter. Liberty chose to foreclose on the secured property (rather than call the quaranty) as a direct result of petitioners' agreement to bid a minimum of $260,000 for the property in bulk. The bank then took possession of the secured property, which consisted largely of African art, and on March 16, 1976, offered the property at a foreclosure auction. As of that date, the outstanding balance due Liberty, including interest and miscellaneous costs, was $255,761. The foreclosure sale was promoted by advertisement in the Wall Street Journal and in the principal newspapers in Dallas, Houston, and Los Angeles,

these being considered by Liberty to be the major markets for the African art being sold. Nevertheless, petitioners' bid of $260,000 was the only bid. The amount of the bid allocable to the 1,202 pieces of African art included in the sale (other items were included in the bulk sale) is $246,909. Thus, by March 1976 petitioners owned approximately 1,300 pieces of African art, for which they had paid slightly more than $400,000.

McNemar was an acquaintance of Tom Seligman (Seligman), the curator at the M.H. de Young Memorial Museum (de Young) in San Francisco, California. Subsequent to the foreclosure auction in 1976, McNemar suggested that petitioners make a charitable contribution of some of the art to that museum. He did not suggest to petitioners, and they did not pursue, the possibility of selling any or all of the art. Mrs. Neely had lived in San Francisco and she considered de Young to be a fine museum. Petitioners donated 112[2] items of African art to de Young in December 1976. In March 1978, de Young sold all but four pieces at an auction gallery. The art was offered without reserve and the museum received a total of $26,075 on the sale. Two of the remaining four pieces were sold in 1983 for a total of $110. Petitioners were dismayed that the art was sold at auction, and decided to make no further donations to de Young.

McNemar had become acquainted with Adolphus Ealey (Ealey), the director of the Barnett-Aden Foundation Gallery in Washington, D.C. (Barnett-Aden) and brought it to the attention of petitioners as a potential donee. Barnett-Aden is a gallery which owns a large collection of Afro-American art. Most of the collection consists of paintings (Afro-American art), as opposed to primitive sculptures such as those donated by petitioners (African art). Ealey acquired the collection in 1971 and has housed it in his personal residence since then. The gallery functions as an archive, lends pieces to schools and museums, and coordinates exhibitions. The gallery owned approximately 12 pieces of African art prior to the 1977 donation by petitioners. It lends African art, only in conjunction with Afro-American art, for the purpose of explaining the association and transition in styling between the two. Petitioners donated 12 pieces of African art to Barnett-Aden in 1977.

---

[2]There is conflict whether the number of pieces donated to de Young was 112 or 114; we accept petitioners' figure of 112.

Subsequent contributions of petitioners' African art were made to Duke University in Durham, North Carolina (Duke). Petitioners' son, while in attendance there, learned that the university's art museum had a minor collection of African art. McNemar contacted the director of the museum to inquire whether Duke might be interested in a contribution from petitioners' collection. An understanding was reached between petitioners and Duke which provided that petitioners would make a permanent loan of the pieces remaining in their African art collection, and that they would make substantial contributions of these pieces to Duke over a period of years. Petitioners donated to Duke 197 pieces in 1978, 96 pieces in 1979, and 25 pieces in 1980. Duke displayed 55 of the items from 1978 to 1981; 2 others were displayed during the first quarter of 1981. None of the other pieces, either lent or donated, has been displayed.

The contributions of African art made by petitioners during the years in issue are summarized as follows:

| Calendar tax year | Donee | Number of items | Claimed[3] | Cost[4] | Allowed[5] |
|---|---|---|---|---|---|
| 1976 | de Young | 112 | $321,200 | $43,106 | $33,575 |
| 1977 | Barnett-Aden | 12 | 60,000 | 7,177 | 5,350 |
| 1978 | Duke | 197 | 683,975 | 29,278 | 75,055 |
| 1979 | Duke | 96 | 270,780 | 6,395 | 33,775 |
| 1980 | Duke | 25 | 167,150 | 5,770 | 20,100 |
| | | 442 | 1,503,105 | 91,726 | 167,855 |

## I. Valuation of Contributed African Art

Petitioners relied on McNemar for his advice and expertise regarding African art and consider him to be a competent and experienced individual in the field. He has acted as their African art consultant since 1972. McNemar lived in Africa for extended periods throughout the 1960's and early 1970's. He began to acquire art for resale in the mid-1960's and has sold

---

[3]Amounts shown in this column are those claimed by petitioners on their Federal income tax returns for the respective years in issue as the fair market values of the items contributed.

[4]Amounts shown in this column are those reported by petitioners on their Federal income tax returns for the respective years in issue as their acquisition costs for the items contributed.

[5]Amounts shown in this column are those determined by respondent in his notices of deficiency dated June 26, 1981 (regarding calendar tax years 1976–78) and Aug. 26, 1982 (regarding calendar tax years 1979 and 1980) as the fair market values of the items contributed.

the same from that time until the present. His activities have embraced the entire spectrum of the art product from "traditional" art[6] at the one end to "tourist" or "airport" art[7] at the other. Traditional art is substantially more valuable than tourist art. In his search for acquisitions, McNemar traveled into various geographic regions of west and equatorial Africa, making his purchases (usually with currency) in the country of origin. Because he is an outsider to African cultures, McNemar was able to witness very few tribal ceremonies in which the art was actually used. McNemar is not, and does not claim to be, an appraiser of African art or any other primitive art. He has obtained a familiarity with the subject through his own "diligent effort," but has no formal education in the area. McNemar handled the details of each of the donations, including arranging for, and assisting in, the appraisals of the art.

James W. Willis (Willis), a San Francisco dealer in primitive art, was engaged by McNemar to appraise the pieces composing the de Young donation. In late 1976, he placed a fair market value of $321,200 on them. Willis at that time appraised a total of 1,070 of the pieces belonging to petitioners at an aggregate fair market value of $2,181,310. Ten of the pieces which remained after the de Young donation were reappraised by Willis in late 1977 at a fair market value of $10,000. These, along with two others, which were appraised by William L. Hommel (Hommel) at a fair market value of $50,000, composed the 1977 donation to Barnett-Aden.

Willis graduated from Pamona College in 1957 with a degree in international relations and did work toward a master's degree in English literature at San Francisco State University until 1968. After that time, he was employed as a professional ceramicist. He describes his present occupation as "dealer in African Oceanic and Polynesian and Indonesian art in San Francisco, where [he] operate[s] a gallery." He first opened a modest gallery, occupying approximately a 10-foot square, in May 1972. In that same year, he made the first of his five trips to Africa. This journey was made for the purpose of purchasing

---

[6]"Traditional" African art is that which is made by a native artist in his African habitat in conformance with the style of his cultural group, intended for use within that culture, and so used.

[7]"Tourist" or "airport" art is that which is specifically made to be sold to tourists and is usually produced in quantity in workshops established for that purpose.

art; his four subsequent trips, each approximately 3 to 4 weeks in duration, were made as an employee of a travel agency to accompany groups of collectors. He has held a number of continuing exhibits in his gallery, has attended auctions in New York, London, and Paris, and had appraised between 5 and 10 collections prior to his 1976 appraisal of petitioners' collection. Petitioners' collection was the first of its size appraised by him. Willis has had no formal education in the area of African art, but has done independent reading on the subject. He asserts that "the majority of [his] experience is in actually handling and considering pieces."

Hommel was recommended by Ealey for the appraisal of the two items donated to Barnett-Aden which had not previously been valued by Willis. Hommel received his baccalaureate degree in 1963 and earned a master's degree in art history (with a concentration in African art) in 1977, while studying under professor Roy Sieber (Sieber) at Indiana University. He continued his studies with Sieber and received a doctoral degree in 1981. He has been a lecturer and consultant on the subject and performed numerous appraisals from 1975 until 1979, in which year he ceased doing appraisal work. Hommel, in the curriculum vitae contained in his expert report offered as evidence before this Court, overstated his academic credentials and experience in the area of African art.

In addition to the appraisal of the two pieces in 1977, Hommel compiled an appraisal report in May 1978 in which he valued all of the pieces remaining in the collection after the 1976 and 1977 donations. This resulted in a substantial overlap of his work with that of Willis. Of the approximately 900 pieces which were valued by both appraisers, not one was ascribed a value by Hommel which was less than or even equal to the value determined by Willis. There was considerable disparity on a preponderance of the valuations. Hommel's values ranged from 250 percent to over 1,600 percent of those of Willis' and averaged approximately 500 percent of the latter's values.

Hommel testifed that his assessment of value is predicated on the assumption that all of the pieces he appraised are traditional art and further indicated that his figures would be in error were such not the case. Hommel relied upon the statement of McNemar that all of the pieces are traditional

art, and upon his examination of them, in performing his valuation. He has not waivered from his opinion that every piece he valued is traditional African art. Hommel defined traditional African art as "an object which was made for use for the culture that it was made."

The values determined by Hommel in his May 1978 report were used by petitioners on their tax return for the pieces donated to Duke in that year. In October 1979, he prepared another report wherein he reappraised the 96 items donated to Duke, and reported on petitioners' tax return, in that year. These items were uniformly valued at 125 percent of the values shown for the same items on the May 1978 report. The values reported on petitioners' 1980 tax return for the 25 items donated to Duke in that year correspond, without any adjustment, to those contained in the May 1978 report.

Before hiring Hommel, McNemar, in March 1978, provided him with photographs of pieces which had been donated to de Young and a checklist containing Willis' corresponding valuations. McNemar requested that Hommel return the materials with his (Hommel's) opinion of value so that McNemar could "know the price range in which [he could] expect [Hommel] to work." McNemar, in the same correspondence to Hommel, indicated that there was a well organized list of the art collection which would minimize the paperwork for the job. His letter further disclosed that the list also contained his (McNemar's) opinion of market value and that "The collection contains over 1,100 objects valued at $6,650,000." Approximately 1,000 of the items which Hommel appraised had been previously ascribed a value on that list by McNemar; over half of the values on Hommel's appraisal report were identical to those contained in McNemar's list.

Respondent's determination of the value of the pieces donated in 1977–80 is based largely upon the appraisals of Irwin Hersey (Hersey). Hersey is the only expert offered by either party, who is a full-time appraiser. Although he has no formal education in the area, Hersey has been a collector of African art for more than three decades and has performed numerous appraisal, authentication, cataloging, and consulting services since 1967. Hersey is a senior member of the American Society of Appraisers; the head of the primitive arts section of the International Society of Appraisers; a member of

the American Association of Appraisers; and a member of the Union Francaise des Experts, with a specialty in primitive art. He has been a consultant to major museums and private collectors and has served as an adviser to the Museum of African Art in Washington, D.C.

Respondent also obtained a valuation report from Sieber regarding the 1979 and 1980 donations to Duke. Sieber has taught the subject of African Art since the early 1950's; has been a professor at Indiana University since the early 1960's (where he earned a named professorship in fine arts in 1974); has authored manifold works on the subject; has made a number of trips to Africa for the purpose of research; has taught at African universities; and has served as consultant to a variety of museums. He is currently the Associate Director for Collections and Research for the Museum of African Art at the Smithsonian Institution, a position which he holds concurrently with his professorship at Indiana. Petitioners recognize Sieber as a leading American Africanist and African art historian.

Hommel was the only expert to opine that all of the donated pieces are traditional African art. Petitioners' own expert, Willis, in addition to respondent's experts, determined that many of the items are not traditional. Hersey and Sieber each determined that nearly 80 percent of the art is not traditional. We find that most of the donated art is not traditional.

The parties have stipulated that the donee institutions (de Young, Barnett-Aden, and Duke) are, and were at the time of the respective contributions, entities described in sections 170(c) and 501(c), donations to which will qualify as deductible charitable contributions.

Respondent raises, for the first time on brief, the proposition that petitioners' deductions for the charitable contributions of their art be limited to their cost basis in the art. This is founded on the alternative arguments that either petitioners were dealers in African art by virtue of the activities of Vaney, or were engaged in activities substantially equivalent to those of a dealer because of the frequency and continuity of their contributions. Because this issue was not raised in the deficiency notice or the pleadings, it was raised untimely and caused surprise and prejudice to petitioners. We therefore will not consider it.

> Any doubts we may have with regard to petitioner's surprise must be dismissed when we consider the potential abuses which could occur by the use of "informal" means of communicating new theories which are not inherent in respondent's original determination. If respondent desired this theory to be before the Court, he could have amended his pleadings to clearly inform the petitioner and the Court of his intended lines of attack. [*Estate of Horvath v. Commissioner*, 59 T.C. 551, 556 (1973).]

See generally *Seligman v. Commissioner*, 84 T.C. 191 (1985), and cases cited therein.

The amount deductible for the gifts is the fair market value of the property at the time of contribution. Sec. 1.170A–1(c)(1), Income Tax Regs.[8] Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under compulsion to buy or sell and each having reasonable knowledge of relevant facts. Sec. 1.170A–1(c)(2), Income Tax Regs.

Respondent's determination of deficiency is presumptively correct and petitioners bear the burden of proof to the contrary. Rule 142(a);[9] *Welch v. Helvering*, 290 U.S. 111 (1933). We have previously said with regard to the issue of market value that—

each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise * * * [*Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980).]

Such a situation is now before us. Petitioners have failed to persuade the Court that respondent's determinations of value are in error. Quite to the contrary, we find that the estimates of value adopted by petitioners are exaggerated and we accordingly reject them.

The valuations determined by Hommel are at best unreliable. He was ostensibly hired to appraise approximately 300 pieces which had not been valued by Willis. Hommel in fact appraised all of the pieces remaining after the 1976 and 1977 donations, about 1,200 in number, even though the bulk of

---

[8]Unless otherwise indicated, all regulation section references are to the Federal Income Tax Regulations (Title 26, Code of Federal Regulations) effective for the tax year or years in issue.

[9]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

these had already been appraised by Willis. Prior to hiring Hommel, McNemar required that he provide an example of the "price range" in which he could be expected to work. According to McNemar, this was so petitioners could ascertain that Hommel would provide values which were not immoderate. However, Hommel's figures for pieces which had been previously appraised by Willis are from 250 to 1,600 percent of Willis' values. Hommel's values for the 1978-80 donations are, on average, approximately 800 to 900 percent of those determined by respondent's experts. It seems that instead of seeking a middle-of-the-road appraiser, petitioners had quite different intentions. Despite the protestations of petitioners and McNemar to the contrary, it appears to us that McNemar "shopped" for an appraiser who could provide values in the right "price range"—a range of values much higher than that provided by Willis—and engaged Hommel for the job.

Additionally perplexing is the fact that approximately 1,000 of the items valued in Hommel's May 1978 appraisal report had previously (in February 1978) been assigned values by McNemar, and Hommel's values for more than one half of these items are identical to McNemar's. Portions of McNemar's list and Hommel's May 1978 appraisal report are reproduced in the appendices. Petitioners offer, as an explanation for this conspicuous improbability, that McNemar prepared his own estimate of value for the purpose of obtaining transit insurance on the 1978 shipment to Duke; that this was necessary because of Neely's insistence upon swift shipment of the items and the slow rate of progress on the then-uncompleted Hommel appraisal; and that McNemar replaced the valuation entries he had made on his list with those of Hommel, obtained by telephone, as Hommel proceeded with his appraisal.

We find this unpersuasive. Hommel had begun work on his appraisal report, dated May 27, 1978, approximately 6 weeks prior to that time. Considering that petitioners did not ship the art to Duke until mid-August of that year, it appears that immediacy was not as paramount a concern as petitioners would have us believe. We consider it significant that petitioners offered only the testimonial evidence of McNemar regarding these purported revisions and have failed to introduce the real evidence in question, i.e., McNemar's original list, which

could readily demonstrate whether such changes had in fact been made. The copy of that list which is in evidence, Exhibit 11-K, is a second or third generation photocopy. We find that Hommel adopted as his own the value figures provided him by McNemar and incorporated them into his appraisal report.

Finally, Hommel based his estimates of value on the erroneous assumption that every piece he appraised was traditional African art. Hommel freely admitted that if any of the pieces were not traditional, his valuation would be wrong. The other expert witnesses differed in their opinions regarding the proportion of the art which is traditional, but there was agreement among all of them, including petitioners' witness Willis, that not all of the art is traditional. Hersey and Sieber each determined that approximately four of every five pieces they examined are not traditional. Hommel's definition of traditional African art is deficient, most conspicuously for its failure to include the actual use of the item within the cultural group as an element. Each of the other experts (including petitioners' expert, Willis) included actual use of the art as an essential element in defining traditional African art. We have found that most of the donated art is not traditional. Because of the questionable circumstances surrounding Hommel's appraisals, and because his values are predicated upon the fallacious assumption that all of the art is traditional, we reject the valuations determined by him.

We have said that although we will not reject expert evidence without objective reasons for doing so, one such reason is that the evidence provided by another expert is more persuasive.[10] Willis began as a dealer in primitive art in 1972 when he opened what he characterized as a modest gallery which occupied only a 10-foot square. He is not affiliated with any organization of appraisers, and had done only 5 to 10 appraisals at the time of his 1976 appraisal for petitioners. Willis testified that he valued the art at prices at which he felt his gallery could sell it. We find it significant that Willis was aware of the de Young auction of the art donated by petitioners and even had someone purchase 2 of the pieces at the auction for him. It is most inconsistent that a dealer in such art, when presented with the opportunity to purchase more

---

[10]*Estate of Gallo v. Commissioner*, T.C. Memo. 1985–363, citing *Buffalo Tool & Die Manufacturing Co. v. Commissioner*, 74 T.C. 441, 452 (1980).

than 100 pieces at less that 10 percent of the price at which he felt he could resell them, would purchase only 2.

We find that the qualifications, background, training, experience, and methodology of respondent's expert Hersey are more compelling than those of Willis. Sieber, although not actively involved in appraisal work, is a leading Africanist and is eminently qualified to distinguish African art which is traditional from that which is not. This fundamental question is crucial to the valuation of the art, since traditional art will command a significantly higher market value than nontraditional (tourist or airport) art. Sieber's valuation report corroborates the valuations determined by Hersey.

For the reasons outlined above, we are persuaded that the valuations determined by respondent in the deficiency notices are not in error. Accordingly, with regard to this issue, we hold for respondent, and find that the amounts deductible are: $33,575 in 1976, $5,350 in 1977, $75,055 in 1978, $33,775 in 1979, and $20,100 in 1980.

## II. Addition to Tax

Section 6653(a)[11] provides that where any part of an underpayment of income tax is due to negligence or intentional disregard of rules and regulations, an amount equal to 5 percent of the underpayment shall be added to the tax. Broadly speaking, for the purposes of this section, "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967). Just as with respondent's determination of deficiency, his determination of negligence or intentional disregard of rules and regulations is prima facie correct with the burden of proof to the contrary on petitioners. *Bixby v. Commissioner*, 58 T.C. 757 (1972). Thus, petitioners must show that they acted reasonably and prudently and exercised due care in obtaining

---

[11]Sec. 6653(a) provides as follows:

SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

the appraisals of fair market value which they used on their tax returns. Regulation section 1.170A–1(c)(1) provides, in general, that a charitable contribution of property other than money is deductible at the fair market value of that property as of the time of the contribution. Fair market value, discussed above, is defined in section 1.170–1(c)(2), Income Tax Regs.

An ordinarily prudent person in the position of petitioners should reasonably have known that the appraisals obtained from Willis and Hommel were in substantial variance with the actual fair market value of the art. Willis' appraisal, upon which petitioners relied for the values claimed in their 1976 and 1977 returns, valued the items donated at an average of approximately 750 percent of acquisition cost in 1976 and 850 percent of cost in 1977. McNemar, from whom the art was acquired, was a dealer in such art at the time he sold it to petitioners or to PAG, and there is no evidence to support a conclusion that he was motivated by other than a profit motive. Petitioners' own evidence indicates that the sales were made at a 10- to 20-percent markup over McNemar's cost.

To reconcile this chasm between petitioners' cost and Willis' market value, we are asked to accept the proffered explanation that McNemar was willing to sell the art to petitioners at a price near his cost (foregoing the remarkable profits he could reap if he were to sell at Willis' estimate of market value) because he feared losing his investment altogether should the export of traditional African art be banned. The ban, according to McNemar's own testimony, was not to be implemented until after 1974. It is stipulated, however, that McNemar's sales to petitioners spanned a period of more than 2 years during 1972–74 and involved at least eight transactions. This course of dealing can hardly be characterized as duress or compulsion to sell. Indeed, McNemar characterized himself as a willing seller and petitioners as willing buyers in the transactions. Surely McNemar could have found a buyer willing to pay more than 10 or 20 percent above his cost if the fair market value were indeed some 800 percent above his cost.

This disparity alone was sufficient cause for a reasonable and prudent person to call into question the valuations determined by Willis, but it did not stand alone. Petitioners were aware of the difficulties of the gallery, PAG, which foundered due to poor sales and ultimately failed. The results

of the foreclosure auction by Liberty and the unsuccessful Dallas auction by PAG indicated that the market value for petitioners' art was well below the values they claimed on their returns. The fact that de Young auctioned the great bulk of petitioners' 1976 donation without reserve, receiving under $27,000 for art which Willis had valued at over $300,000 was additional reason to question the validity of his appraisal figures.

Heedless of these signals, or perhaps despite them, petitioners had McNemar seek another appraiser allegedly for the limited purpose of appraising the approximately 300 pieces which Willis had not appraised. After Hommel provided "a sample of 'the range' in which [he could] be expect[ed] to work," he was engaged to reappraise all the remaining art, which numbered approximately 1,200 pieces, including approximately 900 pieces which had already been valued by Willis. Petitioners' explanation for this duplication of effort is that Willis was too busy to complete his work by appraising the remaining 300 pieces; that these pieces had somehow become "hopelessly intermingled" with the rest of the collection; and that because McNemar did not have the paperwork on hand to determine which of the numbered pieces had not been appraised, it was decided that Hommel would appraise the entire collection. Hommel's valuation figures ranged from approximately 250 percent to 1600 percent of Willis' figures, and averaged approximately 500 percent of the latter's values. Hommel's values average more than 900 percent of those determined by respondent for the 1978 donation and more than 800 percent of respondent's values for each of the 1979 and 1980 gifts. The explanation offered to reconcile the marked disparity between the values determined by Willis and Hommel is that Willis was a West Coast dealer and was not exposed to "East Coast prices" at his gallery; that Hommel used comparable sales made at these "East Coast prices" in his appraisal; and that there was a "rapid expansion" in African art prices between Willis' December 1976 appraisal and that of Hommel in May 1978.

The explanations offered by petitioners have failed to persuade us that respondent's determination of the addition to petitioners' tax is in error. We believe that a reasonable and prudent person in the position of petitioners would recognize

the inconsistency between the appraisals obtained by petitioners and the contrary evidence of value displayed in the aforementioned circumstances, and undertake additional inquiry accordingly. Petitioners have failed to show exercise of due care. To the contrary, their actions, in seeking another appraiser who could provide values in a range more to their liking, point to intentional disregard of rules and regulations. Accordingly, with regard to this issue, we hold for respondent.

## III. Appraisal Related Expenses

Petitioners paid McNemar $25,000 for his assistance in cataloging their African art collection, negotiating the charitable contribution to de Young, and preparing the items for the 1976 appraisal. He was paid $13,600 in 1977 and $11,400 in 1978. Petitioners claimed these amounts on their returns for the respective years as "section 212 expenses relating to art appraisal fees required for the determination of taxable income."[12] Respondent disallowed these deductions for the reason that petitioners had not established that the expenses were either ordinary and necessary business expenses, or that they were expended for the purpose designated. Petitioners make no contention that the expenses were business expenses.

Respondent does not dispute that appraisal fees which are paid to determine the fair market value of property which is part of a charitable contribution are deductible under section 212(3)[13]. It is stipulated that the fees were paid to McNemar for cataloging the collection, negotiating the donation with de Young, and preparing items for the 1976 appraisal by Willis. Of these services, only the negotiations with de Young related solely to the charitable contribution. The catalogue prepared by McNemar embraced the entire collection, which consisted of well over 1,000 pieces, while the de Young donation contained only 112 pieces. Likewise, more than 1,000 items

---

[12]Sec. 212 provides as follows:

SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; or

(3) in connection with the determination, collection, or refund of any tax.

[13]Rev. Rul. 67–461, 1967–2 C.B. 125.

were appraised by Willis in 1976, and McNemar's services extended to all of these, not just the pieces given to de Young.

With regard to the portions of the fees expended in relation to McNemar's efforts in cataloging the collection, we find that these are not deductible under section 212(3). Some part of McNemar's work in cataloging the collection might have facilitated Willis' appraisal, but we find that the project was not commenced, or used, for that purpose. McNemar's own testimony reveals that he and Willis worked on the 1976 appraisal from a listing of the art which had been prepared by neither of them.

The portions of McNemar's fees which relate to his assistance in the 1976 appraisal of items given to de Young and negotiating the donation to de Young come within section 212(3), and are deductible pro tanto. Although petitioners have shown that some part of the amount claimed was properly deducted, they have offered scant evidence from which a proper determination of that amount can be made. See *Lightsey v. Commissioner*, 63 F.2d 254 (4th Cir. 1933), affg. a Memorandum Opinion of the Board of Tax Appeals.

We find that $4,600 of the $25,000 total fee paid to McNemar was properly deductible, $2,502 of this amount in 1977 and $2,098 in 1978. Any inexactitude is of petitioners' own making. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930).

## IV. Office Furniture

When the Doric offices in Oklahoma City were closed, it was decided that the furniture which had been used by Neely at that location would be transferred to him. The book value of the furniture was $11,856 at the time of its transfer to Neely in 1976. Neely did not receive a Form W-2 or Form 1099 reporting the value of the furniture as compensation to him.

A two-page memorandum, authored by the controller of Doric, Doug Polacek (Polacek) and dated August 3, 1976, discussed the transfer of the furniture. The pertinent portion of the memo is as follows:

Jim, these are the arrangements for the closing of the Doric office and the handling of the Doric personnel as agreed to by Joe Sullivan and Roger Briggs.

*Ralph Neely*

His office in Oklahoma City will be continued at Doric's expense until the end of 1976. He is given his furniture which at this time has a net book value of $12,723 (see attachment 1). He also receives (started on April 1, 1976) $4,275 a month for 40 months and $2,500 a month for 120 months. These payments were reserved for on a discounted basis at the time of acquisition (attachment 2 gives a breakdown of expense by year for these payments).

On the second page of the memo, the value of the furniture transferred to Neely is included as one of the estimated expenses for the closing of Doric's offices, along with expenses for employees' severance pay and office moving expenses. Neely testified that he and the president of Doric each received the furniture in their offices and that other furniture was appraised and distributed to the employees of the office. Respondent determined that the transfer of the furniture was not a gift, that the fair market value of the furniture was $11,856, and that petitioner's taxable income for 1976 should be increased by that amount.

Petitioners correctly assert that the most critical consideration in determining whether a transfer is a gift for Federal income tax purposes is the transferor's intention. *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960), citing *Bogardus v. Commissioner*, 302 U.S. 34, 43 (1937). *Bogardus* "makes it plain that the donor's characterization of his action is not determinative—that there must be an objective inquiry as to whether what is called a gift amounts to it in reality." *Commissioner v. Duberstein, supra* at 286, citing *Bogardus v. Commissioner, supra* at 40. Determination as to whether a transfer amounts to a gift must be reached on consideration of all the factors, and the proper criterion is the basic reason for the transferors conduct—"the dominant reason that explains his action in making the transfer." *Commissioner v. Duberstein, supra* at 286. A gift for Federal income tax purposes proceeds from a "detached and disinterested generosity." *Commissioner v. LoBue*, 351 U.S. 243, 246 (1956).

Petitioners argue that because Ralph Neely never received a Form W-2 or Form 1099 regarding the furniture, it is therefore undisputed that Esmark treated the furniture as a gift. We disagree. The nonreceipt of such a form is far from determinative.

The Polacek memo is similarly inconclusive. The only evidence it offers is the clause, "He is given his furniture." But, as noted above, a donor's characterization of his action is not determinative. Furthermore, it is not clear that the language quoted from the memo was intended to characterize the transfer as a gift at all. The sentence following it discusses "consulting fees" which were to be paid to Neely for a period after termination and which were undisputedly taxable income. It could be inferred from the language of the memo that Polacek considered the payment of the "consulting fees" and the "gift" of the furniture to be similar elements in Neely's termination arrangement.

Neely's testimony regarding the circumstances surrounding the "gift" is also unpersuasive. Accordingly, we find that the value of the furniture transferred to Neely must be included by petitioners as income.

Petitioners have presented no evidence, other than the Polacek memo, regarding the value of the furniture. That document ascribes to the furniture a corrected value of $11,856, which amount respondent, in his notice of deficiency, added to petitioners' income for 1976. In their reply brief, petitioners raise for the first time the argument that the market value of the furniture was only a percentage of the aforementioned book value. For reasons discussed above, we will not consider an argument not timely raised. Accordingly, because petitioners have offered no evidence of value, with regard to this issue, we hold for respondent.

## V. Legal Fees

Mrs. Neely's father was president of the Oklahoma Publishing Co. (OPUBCO). He and Mrs. Neely's mother passed away within the span of a few months in 1974. Prior to that time, Mrs. Neely had regularly received financial information regarding OPUBCO and its subsidiaries from her father. The president of the corporation who succeeded him failed to provide Mrs. Neely certain financial information which she desired concerning OPUBCO's operations. Mrs. Neely, who held a substantial amount of OPUBCO stock in her own name, resorted to litigation in the Delaware courts to compel the corporation to make the financial information available to her. OPUBCO provided the requested information to Mrs. Neely

before the case was tried and subsequently, in January 1978, repurchased her stock, as well as OPUBCO stock owned by Ralph Neely.

In the complaint initiating the lawsuit against OPUBCO, Mrs. Neely described her primary purpose for seeking the financial information as her desire "to ascertain the value of her shares of stock and to obtain any information which would enable her to solicit proxies, to sell her shares and to protect her rights and those of her family in the sale of shares of OPUBCO by the Executor in the probate proceedings." (These latter shares were part of the estates of her deceased parents and are not material to the issue at bar; the parties have reached a stipulated agreement with respect to legal fees paid in connection with the stock in the parents' estates.) In response to depositions and interrogatories in that action, petitioners' statements left no doubt that the underlying reason for the suit was Mrs. Neely's desire to sell her shares. Ralph Neely indicated that to his knowledge there was no reason, other than her desire to sell the stock, for her need to value it.

Petitioners paid legal fees in 1977 and 1978 in connection with the aforementioned litigation in the amounts of $12,550 and $32,903, respectively. They argue that these fees were properly deductible under section 212(2)[14] as expenses incurred "in connection with the management and conservation of shares of stock in the Oklahoma Publishing Co. held by Virginia G. Neely for the production of income." They assert that without the financial information, Mrs. Neely could not determine the value of her stock or whether OPUBCO was being properly managed. Respondent disallowed the deductions in both years and contends that the expenses should be capitalized and added to the basis of the stock. We agree.

The question which faces us is whether the expenses may be currently deducted under section 212(2) or should be capitalized as part of petitioners' basis in the stock. Petitioners maintain that although the suit against OPUBCO may have led to information ultimately used in the sale of the stock, the primary objective of the suit was to acquire information concerning the company's finances and management. We have previously said that in distinguishing between currently de-

---

[14]See note 12, *supra.*

ductible and capital expenditures "with respect to litigation expenses in cases involving the acquisition, retention, or disposition of capital assets, the origin and character of the claim, not the purpose for which the claim is prosecuted, are the controlling criteria." *Estate of Davis v. Commissioner*, 79 T.C. 503, 508 (1982), citing *United States v. Gilmore*, 372 U.S. 39, 49 (1963), and *Woodward v. Commissioner*, 397 U.S. 572, 577 (1970), affg. 410 F.2d 313 (8th Cir. 1969), affg. 49 T.C. 377 (1968).

Petitioners suggest that we examine the issues involved, the nature and objectives of the suit for which the expenditures were made, the defenses asserted, the purpose for the expenses, the background of the litigation, and all facts pertaining to the entire controversy out of which the disputed expenses arose, citing *Estate of Morgan v. Commissioner*, 332 F.2d 144, 151 (5th Cir. 1964). The considerations enumerated in *Morgan*, however, are of benefit only to the extent that they illuminate the origin and character of the lawsuit against OPUBCO. Although the narrow purpose of the suit was to compel disclosure of financial information, petitioner's sworn statements in the pleadings and discovery in that case clearly indicate that the origin of the claim was Mrs. Neely's desire to determine the value of her stock for the purpose of selling it.

The only evidence petitioners offer to the contrary is Ralph Neely's testimony in the instant case regarding Mrs. Neely's intention to sell the stock. His testimony, made with the benefit of hindsight, is directly contrary to petitioners' statements made under oath in the Delaware litigation. We believe the latter to be more probative in determining the origin and character of the claim in that suit.

We find that Mrs. Neely's desire to sell her stock was the origin of the lawsuit. It is settled that legal expenses incurred in litigation brought by a seller to determine the selling price of a capital asset are part of the cost of disposition of that asset and are to be treated as capital expenditures and not as deductible expenses. *Wagner v. Commissioner*, 78 T.C. 910, 918 (1982), citing *Woodward v. Commissioner, supra*; *Brown v. United States*, 526 F.2d 135 (6th Cir. 1975). Accordingly, with regard to this issue, we hold for respondent.

## VI. *Respondent's Amendment To Answer*

Respondent filed, pursuant to Rule 41(c), a motion for leave to file a first amendment to answer in each of the docketed cases on March 4, 1985. The amendments lodged with the motion allege that portions of the deficiencies constitute substantial underpayments attributable to tax motivated transactions within the meaning of section 6621(d).[15] That section provides for a rate of interest which is 120 percent of the adjusted rate determined under section 6621(b), and is applicable with respect to interest accruing after December 31, 1984. Petitioners filed a notice of objection on March 22, 1985, alleging that the amendments raise new matter, namely, the

---

[15]Sec. 6621(d) was added by sec. 144(a) of the Tax Reform Act of 1984, Pub. L. 98–369, 98 Stat. 682, 683, and provides, in pertinent part, as follows:

SEC. 6621. DETERMINATION OF RATE OF INTEREST.

(d) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

    (1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b).

    (2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

    (3) TAX MOTIVATED TRANSACTIONS.—

        (A) IN GENERAL.—For purposes of this subsection, the term "tax motivated transaction" means—

            (i) any valuation overstatement (within the meaning of section 6659(c)),

            (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

            (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and

            (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period.

            \*      \*      \*      \*      \*      \*      \*

    (4) JURISDICTION OF TAX COURT.—In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.

Sec. 6659(c) provides as follows:

SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX.

    (c) VALUATION OVERSTATEMENT DEFINED.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).

need for an item-by-item determination of the extent to which the value claimed by petitioners for each piece donated was overstated. Petitioners contend that they would be denied the opportunity to cross-examine respondent's experts regarding these determinations, and that additional briefing would be required. They conclude that granting the motion to amend would therefore be prejudicial to them.

We reject this argument. Petitioners offer no authority for the proposition that a valuation overstatement must be determined on an item-by-item basis and we know of none. In its report discussing the addition of section 6621(d), the Conference Committee noted that—

a number of provisions of recent legislation have been designed, in whole or in part, to deal with the Tax Court backlog. Examples of these provisions are the increased damages assessable for instituting or maintaining Tax Court proceedings primarily for delay or that are frivolous or groundless (sec. 6673), the adjustment of interest rates (sec. 6621), the valuation overstatement and substantial understatement penalties (secs. 6659 and 6661), and the tax straddle rules (secs. 1092 and 1256).

\*       \*       \*       \*       \*       \*       \*

The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court. The positive response that the Court has made to several recent GAO recommendations is encouraging and the conferees expect the Court to implement swiftly these and other appropriate management initiatives. The conferees also note favorably the steps the Court has begun to take in consolidating similar tax shelter cases and dispensing with lengthy opinions in routine tax protestor cases. The Court should take further action in these two areas, as well as to assert, without hesitancy in appropriate instances, the penalties that the Congress has provided.
[H. Rept. 98–861 (Conf.), 1984–3 C.B. (Vol. 2) 1.]

Section 6621(d) engrafts the definition of "valuation overstatement" contained in section 6659(c) as one of the tax motivated transactions it addresses. In discussing amendment proposals intended to put more teeth into section 6659 (regarding penalties for valuation overstatements), the conferees indicated that they were mindful of the need to dissuade—

taxpayers from over-valuing charitable donations of property. This concern relates both to tax shelter promotions which exploit the deductibility of appreciation in capital-gain assets, and to other situations where individuals

buy items on their own initiative specifically for contribution after expiration of the capital gains holding period, or overvalue items which they have held for long periods before donating them to a charity. [H. Rept. 98–861 (Conf.), 1984–3 C.B. (Vol. 2) 1, 252.]

These excerpts make clear the congressional intent behind enactment of section 6621(d). Adoption of the view propounded by petitioners would only serve to frustrate that intent and unduly burden the proceedings in this Court. For example, under petitioners' proposal, if a taxpayer were to make a donation of 10 items of equal value, 9 of which were each valued at 149 percent of its correct value and the last valued at 160 percent of its correct value, the higher interest under section 6621(d) would be imposed on only the valuation overstatement of the 10th item, and the overstatements of the 9 would be ignored. Likewise, if another taxpayer were to make a donation of 10 items of equal value, 9 of which were each valued at its correct value and the last valued at 150 percent of its correct value, the interest penalty would apply to the valuation overstatement of the 10th item, even though the 9 were properly reported. These results would unfairly reward the overreaching taxpayer in the first instance and unjustly punish the substantially compliant taxpayer in the second.

We therefore hold that with regard to a charitable contribution of the type at bar, where multiple items of a similar nature are given to a donee in a single transaction within a given tax year, the aggregate value claimed by a taxpayer should be compared to the aggregate amount determined to be the correct amount of such valuation for the purpose of determining whether there has been a valuation overstatement.[16]

We implicitly reached this conclusion in *Johnson v. Commissioner*, 85 T.C. 469 (1985), which involved a fact pattern similar to that in the instant case. In *Johnson*, the taxpayers made charitable contributions of over 100 American Indian artifacts in 1976 and nearly 200 etchings in 1977. The values claimed for those donations were grossly inflated, and this Court, sua sponte, considered the section 6621(d) issue. We held that the

---

[16]The rule we adopt today might, in some cases, subject a taxpayer to an interest obligation greater than that which would obtain by using the method of determining the amount of a substantial underpayment proposed by petitioners. However, the evidence of record reveals that such is not the situation in the instant case.

taxpayers were liable for the increased rate of interest because their substantial underpayments were attributable to tax motivated transactions. The determination of the valuation overstatements was made by comparing the values claimed on the taxpayers' returns with the amounts we determined to be the correct valuations of the artifacts and etchings.

Since we find that an item-by-item determination is unnecessary, petitioners' claim of prejudice is unfounded. We are unmoved by petitioners' vague reference to "serious constitutional questions that have not been litigated or briefed by the parties" regarding application of section 6621(d) to a taxpayer whose cases have been tried and submitted. That issue was laid to rest by *Johnson v. Commissioner, supra,* which, distinguishing *Law v. Commissioner,* 84 T.C. 985 (1985), held that consideration of the section 6621(d) issue after the close of briefing and argument is appropriate where the imposition of that section turns solely on the issue of valuation of contributed property.

Congress framed section 6621(d) in terms of "tax motivated transactions," and we believe that our holding today, by adopting a transactional approach, comports with the legislative objectives while affording taxpayers the most equitable application of the statute. We therefore grant respondent leave to file the amendments to answer lodged with his motion.

The values claimed by petitioners, the correct amounts of such valuations, and the percentage by which the former exceeds the latter are as follows:

| Docket No. | Tax year | Value claimed | Correct value | Percentage |
|---|---|---|---|---|
| 24184–81 | 1976 | $321,200 | $33,575 | 957 |
| | 1977 | 60,000 | 5,350 | 1121 |
| | 1978 | 683,975 | 75,055 | 911 |
| 26934–82 | 1979 | 270,780 | 33,775 | 802 |
| | 1980 | 167,150 | 20,100 | 832 |

We therefore find that there was a valuation overstatement in each of the years in issue. Because we have found, ante, that petitioners' underpayments of tax are in excess of $1,000 for each of these years, we conclude that the underpayments are substantial underpayments attributable to tax motivated transactions within the contemplation of section 6621(d) and

that petitioners are liable for the rate of interest prescribed by that subsection for all interest accruing after December 31, 1984. Application of that rate shall be made to an amount (i.e., the substantial underpayment) determined pursuant to Rule 155 in accordance with respondent's Temporary and Proposed Regulation section 301.6621-2T, 49 Fed. Reg. 50390 (Dec. 28, 1984).

*Decisions will be entered under Rule 155.*

---

APPENDIX I

VALUATION DATA FOR 1978 DONATION

| *Partial Reproduction of Exhibit 11-K*[1] | | | *Tax return*[5] | *Deficiency notice*[6] |
|---|---|---|---|---|
| *Item* | *Cost*[2] | *McNemar*[3] | *Willis*[4] | | |
| 1 | $50 | $950 | $550 | $2,100 | $100 |
| 5 | 225 | 2,500 | 550 | 2,500 | 150 |
| 6 | 250 | 3,600 | 750 | 3,600 | 250 |
| 13 | 25 | 300 | 75 | 300 | 50 |
| 16 | 125 | 5,000 | 375 | 5,000 | 65 |
| 17A 17B | 40 | 750 | 240 | 750 | |
| 18 | 15 | 300 | 40 | 300 | 50 |
| 22 | 35 | 1,100 | 450 | 1,100 | |
| 23 | 15 | 350 | 50 | 350 | 75 |
| 24 | 75 | | 150 | 800 | 65 |
| 32 | 265 | 3,000 | 650 | 3,000 | 200 |
| 39 | 210 | 3,400 | 900 | 5,300 | 250 |
| 42 | 200 | 2,900 | 1,200 | 4,900 | 250 |
| 48 | 60 | 3,000 | 700 | 3,000 | 150 |
| 55 | 80 | 7,500 | 1,200 | 7,500 | 500 |

---

[1] Exhibit 11-K is a detailed list of petitioners' African art collection originally compiled by L. Deupree in 1977 under the direction of McNemar, who later made additions to it. The first four columns are reproduced from that list.

[2] Figures in this column were added by McNemar and represent the price at which the piece was sold by McNemar to PAG.

[3] Figures in this column were added by McNemar in February 1978 and represent his opinion of value.

[4] Figures in this column were copied by McNemar from the appraisal report prepared in December 1976 by Willis.

[5] Figures in this column are excerpted from the appraisal report prepared in May 1978 by Hommel and are those claimed on petitioners' tax return as the fair market values of the art.

[6] Figures in this column are taken from the appraisal report prepared in September 1980 by Hersey.

VALUATION DATA FOR 1978 DONATION

| | | Partial Reproduction of Exhibit 11-K | | Tax | Deficiency |
|---|---|---|---|---|---|
| Item | Cost | McNemar | Willis | return | notice |
| 56 | $38 | $800 | | $1,000 | $500 |
| 66 | 25 | 3,100 | $700 | 3,100 | 300 |
| 67 | 35 | 2,100 | | 2,500 | 350 |
| 68A 68B | 100 | 6,500 | 650 | 6,500 | 500 |
| 69A 69B | 150 | 6,300 | 750 | 6,300 | 1,000 |
| 86 | 125 | 1,100 | 400 | 2,500 | 300 |
| 87 | 125 | 1,800 | 600 | 2,300 | 300 |
| 96 | 150 | 2,300 | 700 | 4,500 | 250 |
| 97 | 110 | 3,500 | 700 | 4,500 | 400 |
| 100 | 250 | 3,900 | 2,000 | 5,000 | 850 |
| 134 | 325 | 3,800 | 600 | 6,200 | 1,000 |
| 140 | 275 | 4,200 | 800 | 8,000 | 1,000 |
| 160 | 310 | 4,200 | 1,200 | 9,500 | 250 |
| 266 | 1,400 | 40,000 | 3,000 | 40,000 | 850 |
| 270 | 175 | 3,600 | 800 | 3,600 | 500 |
| 271 | 175 | 3,900 | 500 | 3,900 | 1,250 |
| 276 | 125 | 1,400 | 300 | 1,300 | 300 |
| 279 | 125 | 900 | ? | 1,100 | 250 |
| 281 | 300 | 4,800 | 700 | 3,500 | 500 |
| 285 | 15 | 375 | 50 | 375 | 200 |
| 288 | 5 | 325 | 40 | 325 | 350 |
| 289 | 5 | 400 | 30 | 400 | 125 |
| 290 | 10 | 400 | 30 | 400 | 150 |
| 291 | 10 | 400 | 35 | 400 | 50 |
| 292 | 5 | 375 | 40 | 425 | 125 |
| 293 | 5 | 375 | 40 | 375 | 150 |
| 294 | 5 | 500 | 60 | 500 | 150 |
| 295 | 5 | 500 | 40 | 500 | 150 |
| 296 | 10 | 350 | 35 | 350 | 125 |
| 310 | 150 | 3,600 | 900 | 3,600 | 500 |
| 311 | 75 | 4,500 | 700 | 4,500 | 100 |
| 313 | 10 | 200 | 40 | 300 | 150 |
| 314 | 10 | 350 | 45 | 400 | 125 |
| 316 | 200 | 3,100 | 500 | 3,100 | 250 |
| 318 | 200 | 3,300 | 500 | 3,300 | 250 |
| 321 | 200 | 2,100 | 600 | 2,100 | 75 |
| 352 | 210 | 3,800 | 900 | 4,800 | 1,000 |
| 355 | 75 | 2,800 | 900 | 3,200 | 850 |
| 356 | 75 | 2,800 | 900 | 3,200 | 200 |
| 367 | 20 | 500 | 300 | 500 | 150 |
| 393 | 100 | 3,000 | 1,000 | 5,500 | 1,250 |
| 394 | 100 | 3,700 | 900 | 3,700 | 750 |
| 396 | 100 | 9,000 | 3,200 | 9,000 | 2,500 |

VALUATION DATA FOR 1978 DONATION

| *Partial Reproduction of Exhibit 11-K* | | | *Tax return*[5] | *Deficiency notice*[6] |
|---|---|---|---|---|
| *Item* | *Cost*[2] | *McNemar*[3] | *Willis*[4] | | |
| 404 | $40 | $5,900 | $2,600 | $4,000 | $400 |
| 405 | 75 | 2,700 | 850 | 2,700 | 400 |
| 425 | 120 | 4,000 | ? | 4,000 | 1,000 |
| 433 | 30 | 300 | 250 | 300 | 100 |
| 434 | 30 | 300 | 150 | 300 | 100 |
| 445 | 65 | 1,600 | | 1,600 | 500 |
| 446 | 25 | 800 | 200 | 450 | 150 |
| 447 | 20 | 1,200 | 300 | 600 | 125 |
| 448 | 20 | 900 | 200 | 475 | 125 |
| 449 | 20 | 900 | 200 | 475 | 125 |
| 450 | 20 | 1,000 | 200 | 600 | 150 |
| 451 | 20 | 900 | 200 | 550 | 175 |
| 452 | 20 | 950 | 200 | 475 | 125 |
| 453 | 20 | 1,000 | 200 | 550 | 150 |
| 477 | 100 | 3,000 | 800 | 3,800 | 750 |
| 482 | 125 | 3,100 | 400 | 3,100 | 300 |
| 483 | 125 | 750 | 150 | 1,200 | 225 |
| 484 | 125 | 700 | 200 | 1,100 | 225 |
| 485 | 125 | 950 | 150 | 1,200 | 250 |
| 489 | 200 | 2,950 | 600 | 2,900 | 200 |
| 498 | 50 | 1,700 | 500 | 3,200 | 1,000 |
| 501 | 475 | 11,500 | 3,800 | 11,500 | 300 |
| 502 | 70 | 625 | 150 | 1,000 | 200 |
| 506 | 50 | 900 | 250 | 1,000 | 250 |
| 507 | 75 | 950 | 200 | 1,200 | 500 |
| 508 | 90 | 2,200 | 150 | 2,200 | 225 |
| 509 | 80 | 3,500 | 800 | 3,500 | 600 |
| 515 | 30 | 700 | 60 | 700 | 100 |
| 527 | 50 | 5,500 | 800 | 5,500 | 300 |
| 528 | 75 | 8,000 | 300 | 5,000 | 250 |
| 538 | 100 | 2,500 | 500 | 2,500 | 200 |
| 545 | 1,200 | 14,000 | 700 | 14,000 | 1,500 |
| 550 | 50 | 1,500 | 70 | 2,000 | 400 |
| 551 | 50 | 1,100 | 400 | 1,200 | 250 |
| 562 | 100 | 4,000 | 400 | 4,000 | 450 |
| 566 | 100 | 2,000 | 400 | 2,000 | 200 |
| 567 | 300 | 9,500 | 800 | 9,500 | 650 |
| 575 | 50 | 2,900 | 900 | 2,900 | 350 |
| 576 | 50 | 2,700 | 900 | 2,700 | 350 |
| 579 | 3,300 | 35,000 | 9,500 | 35,000 | 350 |
| 585 | 30 | 500 | 150 | 1,500 | 200 |
| 590 | 30 | 500 | 150 | 1,200 | 200 |
| 600 | 50 | 2,000 | 200 | 1,500 | 150 |
| 601 | 50 | 3,500 | 700 | 3,500 | 350 |

VALUATION DATA FOR 1978 DONATION

| *Partial Reproduction of Exhibit 11-K* | | | | *Tax return* | *Deficiency notice* |
|---|---|---|---|---|---|
| *Item* | *Cost* | *McNemar* | *Willis* | | |
| 602 | $50 | $1,000 | $200 | $1,150 | $125 |
| 606 | 150 | 3,000 | 200 | 3,000 | 100 |
| 607 | 10 | 5,500 | 1,800 | 5,500 | 200 |
| 615 | 70 | 1,400 | 350 | 1,500 | 200 |
| 617 | 125 | 3,000 | 250 | 3,500 | 500 |
| 625 | 30 | 900 | 250 | 950 | 200 |
| 631 | 160 | 5,000 | 500 | 5,000 | 250 |
| 632 | 175 | 9,000 | 600 | 9,000 | 250 |
| 633 | 200 | 4,200 | 1,800 | 4,200 | 250 |
| 639 | 200 | 3,200 | 550 | 4,800 | 250 |
| 643 | 200 | 3,100 | 550 | 5,000 | 275 |
| 644 | 75 | 3,200 | 900 | 2,000 | 100 |
| 646 | 200 | 15,000 | 6,500 | 15,000 | 100 |
| 648 | 150 | 3,200 | 1,000 | 3,200 | 450 |
| 652 | 150 | 3,000 | 1,000 | 3,200 | 450 |
| 654 | 300 | 5,800 | 1,200 | 5,000 | 350 |
| 658 | 325 | 12,500 | 1,500 | 12,000 | 600 |
| 659 | 325 | 12,500 | 1,500 | 11,000 | 650 |
| 660A 660B | 1,200 | 25,000 | 6,500 | 25,000 | 1,500 |
| 664 | 200 | 3,500 | 1,500 | 3,500 | 200 |
| 665 | 500 | 4,000 | 1,500 | 4,000 | 500 |
| 667 | 100 | | 400 | 2,000 | 750 |
| 668 | 50 | 900 | | 1,400 | 500 |
| 683 | 175 | 2,500 | 550 | 1,450 | 250 |
| 695 | 100 | 3,100 | 950 | 5,500 | 500 |
| 696A 696B | 300 | 7,500 | 4,500 | 7,500 | 1,250 |
| 704 | 125 | 3,200 | 1,000 | 3,200 | 750 |
| 706 | 100 | 3,200 | 800 | 3,200 | 450 |
| 712 | 400 | 1,800 | 600 | 4,500 | 500 |
| 713 | 250 | 2,500 | 500 | 4,000 | 900 |
| 728 | 250 | 6,800 | 2,500 | 5,000 | 500 |
| 729 | 250 | 4,800 | 2,000 | 4,800 | 5,000 |
| 734 | 265 | 2,500 | 600 | 2,500 | 500 |
| 738 | 415 | 2,200 | | 3,000 | 250 |
| 747 | 110 | 2,500 | | 2,500 | 100 |
| 752 | 100 | 7,500 | | 7,500 | 250 |
| 755 | 300 | 6,500 | | 6,500 | 1,000 |
| 772 | 200 | 4,200 | | 4,200 | 300 |
| 776 | 250 | 9,000 | | 9,000 | 200 |
| 782 | 410 | 21,000 | | 21,000 | 400 |
| 784 | 275 | 8,500 | | 8,500 | 250 |
| 794 | 20 | 650 | | 650 | 250 |
| 795 | 75 | 3,100 | | 3,100 | 500 |

VALUATION DATA FOR 1978 DONATION

| Item | Cost | McNemar | Willis | Tax return | Deficiency notice |
|------|------|---------|--------|------------|-------------------|
| 796 | $40 | $1,100 | | $1,200 | $500 |
| 799 | 310 | 5,800 | | 6,000 | 250 |
| 801 | 225 | 5,500 | | 5,500 | 300 |
| 807 | 400 | 7,000 | | 6,500 | 300 |
| 808 | 400 | 6,500 | | 7,000 | 300 |
| 812 | 125 | 4,800 | | 4,800 | 150 |
| 814 | 200 | 5,200 | | 5,200 | 1,250 |
| 815 | 120 | 3,100 | | 3,500 | 400 |
| 817 | 125 | 3,500 | | 3,100 | 400 |
| 819 | 65 | 1,200 | | 1,400 | 500 |
| 820 | 20 | 700 | | 1,500 | 500 |
| 822 | 20 | 250 | | 350 | 125 |
| 825 | 325 | 4,000 | | 4,000 | 600 |
| 828 | 600 | 4,200 | | 4,200 | 1,000 |
| 835 | 75 | 3,200 | | 3,200 | 200 |
| 845 | 40 | 400 | | 700 | 50 |
| 846 | 25 | 450 | | 900 | 200 |
| 849 | 275 | 3,900 | | 3,900 | 800 |
| 851 | 125 | 4,700 | | 4,700 | 300 |
| 862 | 80 | 950 | | 1,700 | 400 |
| 863 | 150 | 3,000 | | 5,200 | 300 |
| 864 | 200 | 3,000 | | 3,000 | 250 |
| 875 | 125 | 2,000 | | 2,500 | 750 |
| 887 | 325 | 7,300 | | 7,300 | 2,000 |
| 890 | 30 | 2,300 | | 2,300 | 400 |
| 892 | 20 | 2,100 | | 2,100 | 100 |
| 898 | 100 | 1,600 | | 2,000 | 600 |

*Partial Reproduction of Exhibit 11-K*

APPENDIX II

VALUATION DATA FOR 1979 DONATION

*Partial Reproduction of Exhibit 11-K[1]*

| Item | Cost[2] | McNemar[3] | Willis[4] | Hommel[5] | Tax return[6] | Deficiency notice[7] |
|------|---------|------------|-----------|-----------|---------------|----------------------|
| 40 | $50 | $2,600 | $550 | $2,600 | $3,250 | $1,000 |
| 44 | 200 | 3,100 | 1,200 | 4,800 | 6,000 | 300 |

[1]Exhibit 11–K is a detailed list of petitioners' African art collection originally compiled by L. Deupree in 1977 under the direction of McNemar, who later made additions to it. The first four columns are reproduced from that list.

[2]Figures in this column were added by McNemar and represent the price at which the piece was sold by McNemar to PAG.

[3]Figures in this column were added by McNemar in February 1978 and represent his opinion of value.

Valuation Data for 1979 Donation

| | | *Partial Reproduction of Exhibit 11-K* | | | *Tax* | *Deficiency* |
|---|---|---|---|---|---|---|
| *Item* | *Cost* | *McNemar* | *Willis* | *Hommel* | *return* | *notice* |
| 45 | $35 | $1,200 | $500 | $1,200 | $1,500 | $750 |
| 46 | 50 | 6,500 | 350 | 4,500 | 5,625 | 200 |
| 54 | 60 | 3,000 | 500 | 3,000 | 3,750 | 250 |
| 59 | 100 | 3,900 | 250 | 3,900 | 4,875 | 1,000 |
| 80 | 40 | 1,200 | 150 | 4,000 | 5,000 | 1,000 |
| 89 | 125 | 3,800 | 800 | 3,800 | 4,750 | 500 |
| 90 | 135 | 4,100 | 400 | 4,100 | .5,125 | 400 |
| 91 | 90 | 2,300 | 400 | 2,300 | 2,875 | 250 |
| 92 | 125 | 1,900 | 300 | 1,900 | 2,375 | 450 |
| 94 | 110 | 2,300 | 400 | 3,300 | 4,125 | 400 |
| 95 | 175 | 2,300 | 700 | 5,000 | 6,250 | 400 |
| 114 | 50 | 3,100 | 900 | 3,100 | 3,875 | 1,000 |
| 125 | 160 | 3,900 | 850 | 3,900 | 4,875 | 700 |
| 139 | 160 | 4,000 | 1,000 | 4,000 | 5,000 | 1,000 |
| 145 | 150 | 2,800 | 450 | 4,500 | 5,625 | 250 |
| 149 | 250 | 2,500 | 350 | 5,000 | 6,250 | 350 |
| 173 | 125 | 3,500 | 900 | 3,500 | 4,375 | 1,000 |
| 180 | 40 | 2,000 | 250 | 2,000 | 2,500 | 45 |
| 181 | 30 | 700 | 150 | 1,000 | 1,250 | 40 |
| 188 | 40 | 900 | 200 | 1,100 | 1,375 | 45 |
| 192 | 35 | 1,100 | 150 | 1,100 | 1,375 | 30 |
| 193 | 30 | 350 | 150 | 950 | 1,190 | 40 |
| 198 | 25 | 650 | 150 | 900 | 1,125 | 40 |
| 206 | 25 | 750 | 150 | 1,100 | 1,375 | 35 |
| 207 | 35 | 850 | 150 | 1,000 | 1,250 | 40 |
| 208 | 35 | 900 | 150 | 1,300 | 1,375 | 35 |
| 210 | 40 | 750 | 150 | 1,000 | 1,250 | 40 |
| 212 | 80 | 4,300 | 700 | 4,300 | 5,375 | 100 |
| 214 | 25 | 650 | 150 | 1,000 | 1,250 | 35 |
| 215 | 25 | 750 | 150 | 900 | 1,125 | 40 |
| 217 | 30 | 475 | 150 | 700 | 875 | 40 |
| 218 | 30 | 1,300 | 150 | 1,500 | 1,875 | 50 |
| 219 | 40 | 900 | 150 | 1,100 | 1,375 | 45 |
| 220 | 45 | 1,500 | 150 | 1,500 | 1,875 | 60 |
| 222 | 40 | 750 | 150 | 1,000 | 1,250 | 35 |
| 223 | 25 | 800 | 150 | 1,100 | 1,375 | 125 |

[4]Figures in this column were copied by McNemar from the appraisal report prepared in December 1976 by Willis.

[5]Figures in this column are excerpted from the appraisal report prepared in May 1978 by Hommel.

[6]Figures in this column are taken from Hommel's October 1979 reappraisal of the art and are those claimed on petitioners' tax return as the fair market values of the art.

[7]Figures in this column are the greater of the value determined by Hersey in his September 1980 appraisal report or the value determined by Sieber in his July 1981 appraisal report.

VALUATION DATA FOR 1979 DONATION

| | | *Partial Reproduction of Exhibit 11-K* | | | Tax | Deficiency |
|---|---|---|---|---|---|---|
| Item | Cost | McNemar | Willis | Hommel | return | notice |
| 226 | $50 | $1,000 | $150 | $1,200 | $1,500 | $45 |
| 230 | 30 | 475 | 150 | 900 | 1,125 | 40 |
| 232 | 30 | 750 | 150 | 900 | 1,125 | 35 |
| 234 | 35 | 1,600 | 250 | 1,600 | 2,000 | 50 |
| 235 | 90 | 1,800 | 400 | 2,200 | 2,750 | 1,000 |
| 239 | 50 | 725 | 150 | 1,200 | 1,500 | 100 |
| 240 | 50 | 1,800 | 150 | 2,000 | 2,500 | 85 |
| 241 | 40 | 650 | 150 | 1,600 | 2,000 | 45 |
| 242 | 60 | 1,400 | 150 | 2,400 | 3,000 | 50 |
| 243 | 30 | 1,500 | 150 | 1,500 | 1,875 | 50 |
| 244 | 50 | 750 | 150 | 2,000 | 2,500 | 125 |
| 246 | 30 | 600 | 150 | 2,000 | 2,500 | 40 |
| 247 | 40 | 900 | 150 | 2,000 | 2,500 | 45 |
| 249 | 30 | 950 | 150 | 950 | 1,190 | 55 |
| 252 | 35 | 1,400 | 150 | 1,400 | 1,750 | 45 |
| 254 | 30 | 750 | 150 | 1,000 | 1,250 | 40 |
| 256 | 30 | 1,000 | 150 | 1,000 | 1,250 | 35 |
| 258 | 50 | 825 | 150 | 1,500 | 1,875 | 50 |
| 259 | 35 | 1,000 | 150 | 1,200 | 1,500 | 40 |
| 260 | 35 | 1,100 | 150 | 1,400 | 1,750 | 30 |
| 262 | 30 | 650 | 150 | 1,000 | 1,250 | 35 |
| 263 | 50 | 1,700 | 150 | 1,700 | 2,125 | 35 |
| 286 | 40 | 1,000 | 200 | 2,100 | 2,650 | 500 |
| 287 | 10 | 275 | 40 | 500 | 625 | 100 |
| 333 | 80 | 1,800 | 300 | 3,600 | 4,500 | 400 |
| 334 | 75 | 2,000 | 300 | 2,000 | 2,500 | 500 |
| 338 | 30 | 950 | ? | 950 | 1,190 | 35 |
| 339 | 150 | 4,100 | ? | 4,100 | 5,125 | 1,000 |
| 344 | 110 | 3,200 | 1,200 | 4,000 | 5,000 | 1,000 |
| 357 | 75 | 2,800 | 900 | 3,200 | 4,000 | 500 |
| 359 | 75 | 3,000 | 900 | 3,500 | 4,375 | 500 |
| 361 | 75 | 2,800 | 900 | 3,200 | 4,000 | 500 |
| 362 | 75 | 3,000 | 900 | 3,500 | 4,375 | 500 |
| 407 | 125 | 3,200 | 1,800 | 3,200 | 4,000 | 800 |
| 418 | 75 | 3,000 | 400 | 3,000 | 3,750 | 1,500 |
| 435 | 30 | 300 | 150 | 300 | 375 | 75 |
| 437 | 30 | 300 | 150 | 300 | 375 | 75 |
| 438 | 30 | 300 | 150 | 300 | 375 | 85 |
| 469 | 30 | 300 | 150 | 300 | 375 | 75 |
| 580 | 50 | 3,100 | 900 | 3,100 | 3,875 | 500 |
| 581 | 50 | 3,900 | 900 | 3,900 | 4,875 | 500 |
| 582 | 50 | 2,500 | 900 | 2,500 | 3,125 | 500 |
| 891 | 30 | 250 | | 250 | 310 | 75 |
| 900 | 125 | 2,900 | | 2,900 | 3,625 | 800 |
| 945 | 150 | 3,800 | | 3,800 | 4,750 | 800 |

## VALUATION DATA FOR 1979 DONATION

| *Partial Reproduction of Exhibit 11-K* | | | | | *Tax return* | *Deficiency notice* |
|---|---|---|---|---|---|---|
| *Item* | *Cost* | *McNemar* | *Willis* | *Hommel* | | |
| 958 | $250 | $6,000 | | $6,000 | $7,500 | $1,000 |
| 993 | 35 | 400 | $150 | 1,000 | 1,250 | 35 |
| 1043 | 20 | 900 | | 1,300 | 1,625 | 1,000 |
| 1101 | 20 | 300 | 70 | 700 | 875 | 200 |
| 1109 | 100 | 1,200 | 70 | 1,500 | 1,875 | 1,000 |
| 1157 | 50 | 600 | 300 | 2,000 | 2,500 | 850 |
| 1159 | 50 | 1,800 | 500 | 3,300 | 4,125 | 800 |
| 1160 | 50 | 1,600 | 500 | 3,000 | 3,750 | 500 |
| 1174 | 120 | 650 | 150 | 3,500 | 4,375 | 125 |
| 1194 | 75 | 3,200 | 700 | 3,200 | 4,000 | 200 |
| 1206 | 80 | 2,200 | 400 | 3,500 | 4,375 | 500 |
| 1231 | 125 | 4,300 | 1,000 | 3,700 | 4,625 | 800 |
| 1240 | 75 | 2,900 | 1,100 | 4,000 | 5,000 | 1,250 |

## APPENDIX III

### VALUATION DATA FOR 1980 DONATION

| *Partial Reproduction of Exhibit 11-K[1]* | | | | *Tax return[5]* | *Deficiency notice[6]* |
|---|---|---|---|---|---|
| *Item* | *Cost[2]* | *McNemar[3]* | *Willis[4]* | | |
| 9 | $200 | $2,900 | $700 | $2,900 | $400 |
| 443 | 450 | 7,500 | 2,500 | 7,500 | 600 |
| 888 | 350 | 9,500 | | 9,500 | 550 |
| 956 | 300 | 5,900 | | 5,900 | 600 |
| 1106 | 625 | 3,850 | 900 | 4,300 | 1,200 |
| 1200 | 50 | 4,500 | 900 | 4,500 | 1,500 |
| 1201 | 225 | 5,500 | 1,200 | 5,500 | 350 |
| 1232 | 120 | 3,300 | 750 | 3,300 | 350 |
| 1233 | 120 | 3,300 | 750 | 3,300 | 350 |
| 1278 | 20 | | | 1,400 | 1,000 |

[1]Exhibit 11–K is a detailed list of petitioners' African art collection originally compiled by L. Deupree in 1977 under the direction of McNemar, who later made additions to it. The first four columns are reproduced from that list.

[2]Figures in this column were added by McNemar and represent the price at which the piece was sold by McNemar to PAG.

[3]Figures in this column were added by McNemar in February 1978 and represent his opinion of value.

[4]Figures in this column were copied by McNemar from the appraisal report prepared in December 1976 by Willis.

[5]Figures in this column are excerpted from the appraisal report prepared in May 1978 by Hommel and are those claimed on petitioners' tax return as the fair market values of the art.

[6]Figures in this column are the greater of the value determined by Hersey in his September 1980 appraisal report or the value determined by Sieber in his July 1981 appraisal report.