LESLIE DONNA ROSS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ross v. Commissioner
Docket No. 9416-87
United States Tax Court
T.C. Memo 1989-682; 1989 Tax Ct. Memo LEXIS 682; 58 T.C.M. (CCH) 1069; T.C.M. (RIA) 89682; December 28, 1989
Leslie Donna Ross, pro se. Carol-Lynn E. Moran, for the respondent. TRUWE MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined a deficiency in petitioner's 1981 Federal income tax and additions to tax as follows: Additions to Tax
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
$ 2,316.00
$ 115.80
50 percent of
the interest due
on $ 2,316.00
*683 The issues for decision are: (1) Whether petitioner understated her tip income for the taxable year 1981; and (2) whether petitioner is liable for additions to tax for negligence or intentional disregard of rules and regulations pursuant section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Leslie Donna Ross, petitioner, resided in Mays Landing, New Jersey when she filed her petition in this case. She timely filed her Federal income tax return for the 1981 taxable year. During 1981, petitioner worked as a cocktail server on the grave shift at the Golden Nugget Hotel and Casino (Golden Nugget), in Atlantic City, New Jersey. The grave shift was from 10:00 p.m. until closing. Petitioner's principle duty as a cocktail server was to serve complimentary beverages to players in the gaming areas of the casino. Through the course of her *684 work, petitioner regularly received tips, which were either in the form of gaming chips or cash. Prior to 1981, petitioner had no previous experience working as a cocktail server. In 1981, respondent conducted an undercover surveillance in seven Atlantic City, New Jersey casinos, in which special agents observed cocktail servers serving complimentary drinks to players in the gaming areas of the casinos. The Golden Nugget was one of the casinos involved in the surveillance. Each special agent received copies of floor plans of the seven different casinos, and were provided sheets showing the colors of the casino chips and their values. In addition, they were given 3 by 5 index cards which indicated the date, time of day, casino, and the gaming area of the casino in which they were to conduct their surveillance. The special agents' assignments as indicated on the 3 by 5 index cards were based upon a random selection generated by a computer program. In the event that a gaming area to which the special agent was assigned was closed, the 3 by 5 index card assigned 3 alternate gaming areas. If the gaming area was open but there were no players or only a few players, the special agents *685 remained at that gaming area and conducted their surveillance. When the special agents arrived at their assigned area of the casino they were instructed to observe one cocktail server for 30 minutes and record, on the 3 by 5 index card, the number of drinks that were served, the amount of tips received by the cocktail server, and the cocktail server's identification number. The agents only recorded the number of drinks served and the amount of tips earned during the 30-minute surveillance period. The special agents were instructed to use a conservative approach if they were unsure of the denomination of a tip. For example, if the cocktail server received change and the agent was unsure whether it was a silver dollar, fifty-cent piece, or a quarter, the agent counted the amount as a quarter. Similarly, if the agent was unsure of the amount of currency given, he counted the amount as a dollar, and if the agent was unsure as to the amount of a chip given, he counted it as a dollar chip. The special agents had no difficulty counting the number of drinks served or calculating the amount of tips that the cocktail servers received, during the 30-minute surveillance periods. From June *686 through December 1981, the special agents conducted 415 of these 30-minute surveillances, in seven casinos including the Golden Nugget. Of these 415 surveillances, 156 were conducted on the grave shift, 24 of which were conducted at the Golden Nugget. The data collected by the special agents was statistically analyzed to determine the hourly rate of tips that the cocktail servers had received. The results of the statistical analysis showed that there was no significant difference, in the amount of tips received, between the days of the week or between the seven different casinos. The analysis, however, did find a significant difference between the shifts worked. Day shift cocktail servers made considerably less tips per hour than either swing shift or grave shift cocktail servers. Separate tip rates were, therefore, established for each shift. These tip rates were reduced by an estimated amount of tips that the cocktail servers paid out to bartenders pursuant to existing practice. Respondent's analysis concluded that cocktail servers who worked the grave shift earned $ 13.76 per hour in tips. Due to a mathematical error, however, respondent in his notice of deficiency used a *687 tip rate of $ 12.62 per hour when reconstructing petitioner's tip income for 1981. [2] As shown on the Golden Nugget's payroll records, petitioner worked a total of 1,314.5 hours during 1981. Petitioner worked 1,204.96 of these hours in a tip earning capacity. Respondent determined that petitioner earned $ 15,206 in tip income during 1981 instead of the $ 5,745 that she reported on her 1981 Federal income tax return. Petitioner prepared a diary which purported to show the dates and number of hours which she worked, and the amount of tips which she earned during 1981. The diary reflects that petitioner worked 1,242.5 hours and earned $ 5,344 in tips during 1981. OPINION The first issue for decision is whether petitioner understated her tip income for taxable year 1981. Gross income includes all income from whatever source derived. Sec. 61(a); Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). It is well established that tips received by a taxpayer constitute gross *688 income under section 61. Sec. 1.61-2(a)(1), Income Tax Regs.; Catalano v. Commissioner, 81 T.C. 8, 13 (1983), affd. sub nom. Kroll v. Commissioner, 735 F.2d 1370 (9th Cir. 1984); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). Taxpayers are required to maintain sufficient records to enable respondent to determine their correct tax liability. Sec. 6001. In situations, such as the instant case, where taxpayers receive daily income from tips, this necessarily requires the maintenance of accurate and contemporaneous diaries or records of tip income received. Sec. 1.6001-1, Income Tax Regs.; Bruno v. Commissioner, T.C. Memo. 1985-168; Applegate v. Commissioner, T.C. Memo. 1980-497. If a taxpayer fails to maintain any records of tip income, or if his records do not accurately reflect income, then respondent is authorized to reconstruct income by a method which in his opinion clearly reflects income. Sec. 446(b); Meneguzzo v. Commissioner, supra; *689 Applegate v. Commissioner, supra.Although respondent's reconstruction of a taxpayer's income need not be exact, it must be reasonable under the facts and circumstances. Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). Respondent's determination that petitioner understated her tip income is presumed correct, and petitioner bears the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Petitioner contends that respondent's use of statistical sampling was an inappropriate method of reconstructing her income. She contends that since each cocktail server has their own individual work habits, respondent cannot lump all cocktail servers into one group and reconstruct their income based upon the same hourly rate. Specifically, petitioner contends that she should not be included in the population because she had no prior experience working as a cocktail server and that she was shy, thereby directly affecting her work performance and the amount of tips she earned during 1981. The record reflects, however, that petitioner was an above average employee and that she diligently performed her work. In addition, *690 petitioner's former supervisor testified that she had received compliments from players about petitioner's work performance. Petitioner argues that the 24 surveillances that were conducted on the grave shift at the Golden Nugget is an insufficient sample size to determine her hourly tip income. Respondent introduced an expert report that analyzed the tip income data collected by the special agents. The expert who prepared the report has been a mathematical statistician for the Internal Revenue Service since 1973, and has a Bachelor of Science in Mathematics, and a Master of Science in Applied Statistics. The report concluded that the methodology applied by respondent to reconstruct petitioner's tip income was statistically valid. In making this conclusion, the report analyzed the randomness and sufficiency of the sample. The sample size consisted of 415 surveillance periods, in which the time of day, day of week, and casino were randomly selected by use of a computer program. The shift, time of day, and casino were sufficiently represented by the sample periods selected by the computer. The report concluded that the data sample exhibited sufficient randomness. The report next *691 analyzed the sufficiency of the sample, and concluded that the sample size is sufficient to form valid conclusions from the data collected for each of the three shifts. The surveillance data used in the instant case was also used in Bruno v. Commissioner, supra. The hourly tip rate that respondent used to reconstruct the taxpayers' income in Bruno, however, was not computed in the same manner as the hourly tip rate used to reconstruct petitioner's tip income in the instant case. In Bruno, the taxpayers were employed by Resorts International Hotel and Casino (Resorts) in Atlantic City, New Jersey, as cocktail servers. Respondent reconstructed the taxpayers' tip income for 1978 by using an hourly tip rate that was based upon the 1981 surveillance data and unreliable internal records maintained by Resorts. We found that respondent's 1981 surveillance data provided statistically reliable data from which an accurate estimate of tip income per hour could be calculated, and recomputed the taxpayers' hourly tip rate by relying primarily upon the surveillance data collected by respondent's special agents during 1981. In light of our holding in Bruno v. Commissioner, supra, *692 and respondent's expert report, we find that respondent's method of reconstructing petitioner's tip income for 1981 was reasonable under the circumstances. Petitioner's next contention is that the data collected by the special agents was erroneous. She argues that 2 of the 24 half-hour observations conducted at the Golden Nugget, on the grave shift, occurred when the casino was closed and therefore, respondent's reconstruction of her tip income is inaccurate. There is no evidence in the record, however, supporting petitioner's contention that the Golden Nugget was closed during any of the surveillance periods reported by respondent's special agents. Petitioner contends that the hourly tip rate that respondent used to reconstruct her income is inaccurate because it fails to account for instances when she was not working in a tip earning capacity. Respondent determined that petitioner worked 1,204.96 hours in a tip earning capacity during 1981. This figure was derived from the total hours petitioner worked during 1981, as reflected on the Golden Nugget's payroll records, which was reduced by 30 minutes for each shift petitioner worked to account for meal breaks. Petitioner argues *693 that respondent failed to take into consideration other break periods that petitioner received on her shift, or when petitioner was sent home early, or when service was stopped for the last 15 to 30 minutes at the end of the grave shift. Respondent's survey, however, accounts for these instances where petitioner was not working in a tip earning capacity. The special agents were instructed to observe one cocktail server for a 30-minute period, and record the number of drinks served, and the amount of tips received. If the cocktail server that was being observed, took a break, for example, this would have been reflected in the special agent's surveillance in that the agent would not have observed the cocktail server receiving any tips. Petitioner contends that the number of hours respondent used in reconstructing her 1981 tip income was incorrect. Based upon payroll records from the Golden Nugget, petitioner worked 1,314.5 hours during 1981, of which petitioner worked 1,204.96 hours in a tip earning capacity. Petitioner argues that the some of the hours she worked during 1980 were reflected on the Golden Nugget's payroll records as being worked in 1981. Petitioner offered into *694 evidence a payroll stub, dated January 4, 1981, purporting to show that she worked 64.25 hours. Petitioner testified that the date on the payroll stub represented the last day of the pay period. Based upon this evidence, we are not persuaded by petitioner's argument. To the contrary, the record reflects that there were no mistakes in the payroll records of the Golden Nugget, as to the number of hours that petitioner worked during 1981. Petitioner contends that respondent failed to account for tips that petitioner claims she paid out to bartenders and bar porters. Based upon the surveillance data collected by respondent's special agents and using the lower 95-percent confidence limit, respondent determined that cocktail servers who worked the grave shift earned $ 15.39 per hour in tips. Respondent determined, based upon the labor union's policy and interviews with individual cocktail servers, that the cocktail servers paid 15 percent of the tips they earned per shift, after earning their first $ 25.00, to the bartenders. Respondent reduced this $ 15.39 tip rate to $ 13.76 per hour in order to account for the amount of tips that cocktail servers paid to bartenders. Petitioner concedes *695 that respondent did account for the amount of tips that cocktail servers paid out to bartenders, but argues that she paid tips to bartenders before she had earned $ 25.00 per shift. In addition she argues that she also paid a couple of dollars per shift to the bar porters. Petitioner has failed to establish, however, the amount of tips, if any, that she paid out to bartenders below the $ 25.00 threshold, and to bar porters, so as to meet her burden of proof that respondent's reconstruction of her income was erroneous. Petitioner contends that the revenue received is an inaccurate gauge for determining the number of drinks actually served to players. Petitioner's argument is similar to the taxpayers' argument in Bruno v. Commissioner, supra where we rejected respondent's hourly tip rate because it was based upon unreliable internal accounting data. In the instant case, however, the hourly rate that respondent used to reconstruct petitioner's tip income is not based upon internal accounting data from any of the casinos surveyed. Rather, respondent's hourly tip rate is based upon the amount of tips the cocktail servers received during the 30-minute surveillance *696 periods, as observed by respondent's special agents. Petitioner's argument is, therefore, without merit. Petitioner contends that her tip income is accurately reflected in a diary which she alleges she maintained on a daily basis during 1981. Petitioner's diary reflects that she earned $ 5,344 in tip income during 1981. In subsequent years, however, petitioner has reported approximately twice as much tip income. During 1984 petitioner reported $ 9,747 in tip income. During 1985 petitioner reported $ 11,311 in tip income. Petitioner worked for the Golden Nugget during both years. Petitioner explained that she earned fewer tips in 1981, as reflected in her diary, because the casino was overstaffed and therefore there were fewer tables to serve. Petitioner testified that the Golden Nugget laid off several cocktail servers in 1981. The record reflects, however, that the Golden Nugget did not lay off any cocktail servers during 1981. The Golden Nugget opened in December 1980 and through 1981 the casino floor was very crowded and the gaming tables were full. During the first 3 months of 1981 it was difficult even to walk on the casino floor. In 1981, the beverage department of *697 the Golden Nugget reported its highest revenue in the history of the Golden Nugget. The volume of business in 1984 and 1985, however, was substantially less than the volume of business during 1981. We are not persuaded that petitioner's diary accurately reflects the amount of tips that she earned during 1981. Petitioner has failed to meet her burden of proof. Accordingly, respondent's determination that petitioner understated her tip income for 1981 is sustained. The next issue for decision is whether petitioner is liable for the additions to tax under sections 6653(a)(1) and (2), for taxable year 1981. Section 6653(a)(1) imposes a 5 percent addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for a separate addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Respondent's determination *698 is presumed correct and petitioner bears the burden of proving otherwise. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Rule 142(a). Negligence within the meaning of section 6653(a) has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Because this Court finds that petitioner understated her tip income, and that her books and records failed to accurately reflect her income as required by section 6001, respondent's determination regarding the additions to tax is sustained. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has not asked for an increased deficiency to correct his mathematical error.↩