ALFRED L. AND MARY E. HARSTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harston v. Commissioner
Docket Nos. 19028-87, 24949-88
United States Tax Court
T.C. Memo 1990-538; 1990 Tax Ct. Memo LEXIS 592; 60 T.C.M. (CCH) 1008; T.C.M. (RIA) 90538; October 17, 1990, Filed Decisions will be entered under Rule 155. *593 Michael L. Cook, Ira A. Lipstet, and William P. Cejudo, [1] for the petitioners. William R. Leighton, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT *594 AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income tax for the years 1983, 1984, 1985, and 1986 in the following amounts: Additions to Tax Under Sections
Year
Deficiency
6653(a)(1) [2]
6653(a)(1)(A) 6653(a)(2)
1983
$ 3,480.00
$ 174.00
$  - - -  *
1984
7,404.00
370.20
- - -  *
1985
5,176.00
258.80
- - -  *
1986
4,175.00
- - -
208.75
- - -
Additions to Tax Under Sections
Year
6653(a)(1)(B)
6661(a)
1983
- - -
$   - - -
1984
- - -
1,614.00
1985
- - -
1,294.00
1986
*
- - -
*595 Because of issues common to both cases, docket Numbers 19028-87 and 24949-88 were consolidated prior to and in preparation for trial. After concessions, [3] the issues for resolution are: (1) Whether petitioners' horse breeding was engaged in for profit; and (2) whether petitioners are liable for additions to tax under sections 6653(a)(1), 6653(a)(2), and 6661(a). FINDINGS OF FACT The stipulation of facts and attached exhibits are incorporated by this reference. At the time the petitions in these cases were filed, petitioners Alfred L. and Mary E. Harston, husband and wife, resided in Boerne, Texas. They filed joint Federal income tax returns for all 4 years at issue with the Internal Revenue Service Center at Austin, Texas. After an 8-year career as a registered nurse, Mrs. Harston obtained a bachelor's degree in business administration and a master's degree in accounting. She is currently *596 a candidate for a Ph.D degree in accounting. Mrs. Harston has also worked in public and corporate accounting capacities. She has been employed as an accounting instructor for Schreiner College in Kerrville, Texas, since 1982. Mr. Harston, who is an attorney, obtained his law degree in 1951 and served for 27 years in the United States Army. He retired from military service as a colonel in June 1974. From 1974 until 1981, Mr. Harston taught in Florida. He also taught on a part-time basis in Texas until 1984. Mr. Harston received pension distributions from the Federal Government in each of the years at issue. During the years under consideration, the couple's teaching income was also supplemented by modest interest and money market income. Alfred Harston rode horses throughout his life. Mary Harston took riding lessons while the couple resided in Miami, Florida. In 1976, while living in Miami, the Harstons purchased their first horse, an Arabian named El Presidente. El Presidente was purchased exclusively as a pleasure horse. As a result of owning and showing El Presidente, the Harstons were introduced to the Arabian horse market. Through their involvement with these horses, *597 they became aware that the Arabian horse market of the late 1970's could be very lucrative. In 1979, Mr. and Mrs. Harston undertook an investigation of the Arabian breeding business. They talked with their stable manager about barns and about farm operating expenses. They investigated local real estate for prospective horse farms. The Harstons also consulted two Miami horse trainer/breeders to investigate the income to be earned in a breeding business. Revenue in this business is generated from the sale of breedable foals and from stallion fees. The bloodline of an Arabian largely determines the demand for a particular horse and hence affects the horse's breeding value. Thus, petitioners were aware that it would be imperative to show their horses in order to promote the bloodline and establish their breeding reputation. With respect to the actual breeding of Arabians, petitioners understood that the gestation period for an Arabian is 11 months. Following delivery, a mare can conceive beginning the following month. A filly, however, cannot be bred until she reaches the age of 3 years. Similarly, a colt cannot be bred at full capacity as a stallion before the age of 3. Although *598 there is a 3-year-maturation period for offspring retained by owners for breeding purposes, foals are often sold to other breeders within a year or so of birth as weanling/yearlings. At the time petitioners undertook their investigation, there was a strong market for weanling/yearling foals which remained viable until 1985. Based on the advice of trainers and other owners, petitioners devised a performance plan for their breeding business. Petitioners planned to acquire a minimum of two broodmares who would be bred every year and would yield two foals a year. Petitioners also planned to retain the first colt or filly for use as a stallion or broodmare, assuming the horse was of high quality. Essentially, petitioners intended to acquire a core herd composed of two broodmares and one stallion. On the basis of 1979 prices, petitioners projected that such a herd could generate approximately $ 70,000 in annual gross revenue. Based upon a strong weanling market, the Harstons estimated that they could sell two good quality yearling foals for $ 10,000 each thereby generating $ 20,000 a year. Petitioners believed that weanling foals could command these prices despite the fact that *599 petitioners' broodmares were both purchased for much less than $ 10,000. Petitioners also estimated that a stallion bred ten times a year at $ 5,000 a breeding would yield fees of $ 50,000. However, given the lengthy gestation and maturation process, petitioners realized they could not receive any revenue from stud fees for several years. Based on projected foal sales and stud fees they estimated that the venture would begin generating profit in 1985. Petitioners failed to follow their plan and did not maintain the type of herd that they projected would be profitable. In November 1980, petitioners relocated from Florida to Boerne, Texas. Petitioners had relatives in Borne and considered it a pleasant environment. Petitioners also moved to Borne because they had purchased El Presidente from a ranch there and they knew that a nationally recognized expert in the field, Carol Chapman, lived in Borne and would be available to train their horses. More importantly, ranch costs were lower in Texas, particularly ranch real estate. Petitioners purchased an 11-acre parcel of farm land. The land was attractive to petitioners because it could be registered for a lower agricultural property *600 tax rate and it had no zoning restrictions against horse breeding. At the time of purchase, the property included a residence and a barn. The Harstons subsequently built a new barn, which included five stalls, and a feed and tack room. In 1983, after a tornado destroyed the barns, petitioners rebuilt both barns and remodeled the original barn as a foaling barn. Petitioners believed that since they lived in a horse ranch area, these improvements would enhance the value of the property to a future purchaser who might want to use the land for horse breeding or other similar purposes. Petitioners also believed that their land would appreciate in value. At the time of purchase, they paid approximately $ 2,800 per acre and at the time of trial, adjacent property was being offered at $ 4,900 to $ 5,900 per acre. However, no evidence as to the actual value of petitioners' ranch or the value of their horses was offered at trial. Petitioners formally began their Arabian breeding activity on January 1, 1981. The enterprise operated under the name of the AM Ranch. At the highest point of the activity, the Harston's Arabian herd included the following horses: Date of
Horse
Purchase/Birth
Type Price
El Presidente
1976
unknown
unknown Aidaliesa
1981
mare
$ 7,000
Susanna Gloriosa
1981
mare
$ 2,000
Mosal
1981
colt
0
Mosalla
1983
filly
0
*601 Although he was not part of the breeding herd, petitioners retained El Presidente. His bloodlines were similar in quality to those of the subsequently acquired horses and he was occasionally exhibited to publicize the ranch and the type of Arabians to be bred there. In February 1981, petitioners purchased their first broodmare, Aidaliesa. Aidaliesa was a full-blooded Arabian with distinctive bloodlines. Aidaliesa had been bred to a nationally recognized stallion named Mosry and was in foal at the time of purchase. She delivered a colt named Mosal in July 1981. Aidaliesa was not bred during the remainder of 1981. In the spring of 1982, petitioners again bred Aidaliesa with Mosry. She subsequently delivered a good quality filly named Mosalla in January 1983. Aidaliesa was not bred again in 1983 or 1984. Due to a market downturn, she was not bred in 1985. In years 1986-1987, she was leased to other breeders. The lease was a net lease, required no rental payments to the Harstons and allowed the lessees to retain any foals produced by Aidaliesa. Aidaliesa had no foals subsequent to Mosalla. In August 1981, petitioners purchased a second broodmare named Susanna Gloriosa. *602 Susanna was a 5-year-old, half-Arabian, half-quarter horse and was purchased to produce foals which would appeal to the then strong market for larger Arabian quarter horses. Petitioners intended to breed Susanna to Mosal since Aidaliesa could not be bred to her offspring colt. Susanna Gloriosa proved to have a bad temperament. She was very difficult to handle and saddle train and was never bred. Her temperament was so bad that she was not marketable as a pleasure or show horse. Because of her bad reputation and because of a subsequent depression in the quarter horse market, petitioners were unable to sell her. In 1987, they gave Susanna Gloriosa away for no consideration. Petitioners did not replace Susanna to take advantage of the general Arabian foal market which remained good until 1985. Mosal was a good quality foal and was retained by petitioners to be used as a breeding stallion for their herd. Initially, Mosal showed great promise. He was successfully shown in 1982 and 1983 as a yearling and as a 2-year old and won a number of ribbons. Mosal was put in saddle training with Ms. Chapman in April 1984. Petitioners also began to advertise him in national and regional *603 Arabian horse publications. Unfortunately, he became very difficult to handle and was so unmanageable that Ms. Chapman advised that he be gelded. Mosal was gelded in July 1984. Thereafter, the horse was trained in order to be sold as a pleasure and show horse. Petitioners did not purchase another stallion for breeding purposes after Mosal was gelded. Aidaliesa's filly, Mosalla, was of good quality. She was shown as a yearling and placed in several classes. She was trained under saddle and was occasionally shown by petitioners' trainer. In June 1986, she was leased to other breeders under a net lease identical to that executed for Aidaliesa. While on lease, Mosalla foaled in 1986. However, pursuant to the lease terms, the foal was kept by the lessee. Petitioners jointly managed the breeding activity. Mr. Harston, who had previously worked on a ranch, was responsible for the daily feeding, grooming, and exercising of the horses. He was also responsible for the daily maintenance of the ranch. Additionally, he trailered the horses to shows. In the early period of the activity Mr. Harston's involvement was on a part-time basis. However, in 1984 when the herd had grown to five, *604 Mr. Harston terminated his part-time teaching job and devoted 8 hours per day to the breeding activity. Mrs. Harston handled the economic and accounting aspects of the breeding activity. She was responsible for maintaining the ranch's financial records. Her bookkeeping enabled her to compare costs to determine if they would need to cut costs. In fact, the parties stipulated that petitioners' books and records kept for tax purposes were adequate. Mrs. Harston also subscribed to and regularly read Arabian horse publications. She also occasionally showed El Presidente and attended several shows annually to see the other horses exhibited. During the school year, Mrs. Harston spent an average of 10 hours per week on the activity in addition to showing time. This amount increased to 20 hours per week during the summer. In addition to their own experience in managing the venture, the Harstons relied on two professional trainers and veterinarians for advice. Petitioners also followed advice on the training, breeding, and selling of their horses given by these professionals. Petitioners entered the Arabian activity in a period of great expansion. However, this growth later resulted *605 in a market saturation for Arabians and in 1984-1985, the sales market for Arabian horses was poor. The Arabian market changed as a result of these circumstances. Because of the diminished demand for them, Arabians were purchased only as a pleasure/show horses and not for breeding. Accordingly, the market for untrained weanlings was very soft and only those horses which were saddle trained and were polished pleasure horses were potentially saleable. At the time of trial, petitioners had not decided to terminate their breeding activity but decided to halt all breeding and had placed the herd up for sale. In addition to continued advertising of Mosal, petitioners began in 1985 to advertise Susanna Gloriosa, Aidaliesa, and Mosalla for sale in horse journals. Petitioners also promoted the sale of the horses by advertising the horses' bloodline at shows and by informing their professional advisors and other breeders that their horses were for sale. Petitioners also investigated selling Aidaliesa through regional horse auctions. In 1986, both Aidaliesa and Mosalla were leased to other breeders. Both net leases were extended until October 1987. Despite the leases, both horses were *606 available for sale. Petitioners also gave Susanna away for no consideration in 1987. As of the time of trial, none of the other horses had been sold. The Harston's still own the entire original herd, including El Presidente who is now 22 years old, and partially blind. From 1981 until 1986, the following income and expenses were generated by the horse breeding activity. Year
Revenue
Taxes/Interest
Depreciation
Other
Net Loss
1981
$     0 $ 1,117      $ 5,299    $ 11,520
$  17,936
1982
8 1,147      10,378    13,420
24,937
1983
0 949      9,614    15,243
25,806
1984
390 745      12,482    14,841
27,678
1985
140 737      6,569    13,779
20,200
1986
1,033 250      4,758    9,940
13,915
Total
$ 1,571 $ 4,945      $ 49,100   $ 78,743
$ 130,472
The income in years 1984, 1985, and 1986 was generated from incidental non-breeding sources. Petitioners' returns for 1983, 1984, 1985, and 1986 were selected for audit. Respondent disallowed petitioners' Schedule F farm losses based on his determination that the *607 horse breeding was not an activity engaged in for profit. In his notice, respondent also determined additions to the tax for negligence and for substantial understatements of income. Petitioners contest the loss disallowance and the additions to tax. OPINION 1. Section 183
Initially we must decide whether petitioners' horse breeding activity was not engaged in for profit. Section 183(a) provides that individual taxpayers will not be allowed deductions which are attributable to an "activity * * * not engaged in for profit." This term of art is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under paragraph (1) or (2) of section 212 [expenses engaged in for the production of income]." Section 183(b) permits deductions, but only to the extent of any gross income generated from the activity. Deductions which are not dependent upon profit objective are also allowable (i.e., interest under section 163) pursuant to section 183(b). *608 In the case of a horse training or breeding activity, if gross income derived from the activity for 2 or more taxable years in a period of 7 consecutive taxable years exceeds the deductions attributable to such activity then the activity is presumed to be an activity engaged in for profit. Sec. 183(d). Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Keanini v. Commissioner, 94 T.C. 41 (1990). In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Petitioners *609 bear the burden of proving that they possessed the required profit objective. Rule 142(a); Dreicer v. Commissioner , supra; Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In determining whether an activity is engaged in for profit, reference is made to objective standards, taking into account all of the facts and circumstances of each case. Sec. 1.183-2(a), Income Tax Regs. The regulations set forth nine criteria normally considered for this purpose. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; *610 (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.
Since gross income did not exceed deductions from the activity in any year under consideration, petitioners are not entitled to the section 183(d) presumption. Petitioners nonetheless argue that they had the requisite profit objective with respect to their horse breeding activity. Conversely, respondent asserts that the activity was not engaged in for profit. We agree with respondent. Because the parties argued their respective cases by addressing each of the nine criteria enumerated in the regulations, we will follow the same approach in our discussion. Petitioners' failure to follow the operating plan, and to attain or retain the horses necessary to effectuate it, indicates that the activity was not carried on in a businesslike manner. Petitioners testified that they intended to acquire a herd comprised of a stallion and two broodmares which would generate two yearling foals a year. In years prior to 1985, the weanling foal market was strong. Had petitioners' actions been dictated by a profit objective, *611 they would have followed their plan and consistently bred their mares in order to avail themselves of the foal market. Instead, Susanna Gloriosa was never bred. Additionally, when it was clear that she was bad tempered, she was not immediately replaced with another broodmare. Also, given that the value of an Arabian is determined by the quality of its bloodline, Susanna's peak market purchase price of $ 2,000 indicates that any offspring would not command a sales price of $ 10,000 which petitioners testified that they expected. Apparently, this was not a horse petitioners purchased to make their breeding activity profitable. Furthermore, although Aidaliesa delivered two foals in the years before the market decline, petitioners' efforts to breed her do not reflect adherence to the plan whereby she would give birth to a foal every year. She was not rebred in 1981 after delivering Mosal and she was not rebred in 1983 after Mosalla. [4]
*612 Additionally, petitioners did not replace their potential stallion, once it was determined that he would be gelded. It is clear that the continuation of the herd depended on the existence of a stallion and it is peculiar that Mosal was never replaced so a stallion would be available for breeding, the business petitioners argue they were in. The fact that Mosal was gelded suggests that petitioners were more interested in showing the horses than in making a profit from breeding them. Although Mosal, a fine quality horse, was gelded to make him more manageable for riding, he was subsequently unable to breed. The breeding of this stallion was the focus of petitioners' plan and was essential to the profitability of their horse activity. Despite their failure to follow the breeding plan, petitioners assert that their bookkeeping and advertising efforts indicate that the breeding activity was carried on in a businesslike manner. Petitioners' bookkeeping efforts do reflect an effort to keep records in a businesslike manner. In fact, the parties stipulated that the Harstons' books and records were adequate for tax purposes. Petitioners also showed both Mosal and Mosalla. However, with *613 the exception of advertising regarding Mosal, petitioners did not advertise until 1985 when the entire herd was put up for sale. Prior to that time, petitioners had no foaling or stud activity requiring advertising. It is this lack of business activity which strongly indicates that the breeding endeavor was not carried on in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs.
Petitioners argue that they intended to grow the herd from Aidaliesa and any filly or colts she might foal. They assert that given the 3-year breeding maturation periods involved with Arabians, they did not intend to generate revenues and profits from foal sales or stud fees until 1985. To avoid breeding offspring with its dam, petitioners necessarily needed a second, unrelated broodmare and we find petitioners' assertion that they intended to grow the herd solely from Aidaliesa unreasonable. Moreover , while the 3-year period would undoubtedly affect Mosal's ability to bring in stud fees it would not affect the ability to produce weanlings from two broodmares. In light of petitioners' plan to generate two foals a year, in light of their purchase of Susanna as a second broodmare, *614 and in light of the strong weanling market prior to 1985, we do not accept the argument that petitioners would not be in a position to generate revenue from yearling foals for 3 years. They also argue that Susanna was impossible to sell and that the Arabian market downturn dissuaded them from replacing Susanna and Mosal. However, we believe that a prudent business person would have replaced this pivotal broodmare in order to take advantage of foal sales in those years prior to the downturn. Similarly, replacement of the stallion would have put petitioners in a position to take advantage of any market turnaround. Since they were not willing to do these things, petitioners continuation in the market after 5 dismal years suggests a lack of profit objective. Dreicer v. Commissioner, supra.
Petitioners prepared for the breeding activity through extensive study of its accepted business, economic, and scientific practices. Sec. 1.183-2(b)(2), Income Tax Regs. They also consulted trainers, breeders, and others expert in the field. Based on this preparation, petitioners formulated a plan of operation which relied on the acquisition *615 of two broodmares and a stallion which would generate foal and stud fees of approximately $ 70,000. However, the facts indicate that petitioners did not carry on the activity in accordance with the plan they promulgated. They failed to breed Susanna, they failed to timely replace her, they did not breed Aidaliesa every year, and they gelded their only stallion and did not immediately replace him after this event in the spring of 1984. Had petitioners followed their plan and implemented what they learned in preparing to enter the business, they would have had some weanling foals to sell during the peak market period prior to the collapse. Where the taxpayer undertakes preparation for the activity but does not carry on the activity in accordance with that preparation, a lack of profit objective may be indicated. Sec. 1.183-2(b)(2), Income Tax Regs.
The record indicates that Mrs. Harston spent approximately 20 hours a week during the summer and 10 hours a week during the school year devoted to the breeding activity. Mr. Harston also spent approximately 40 hours *616 a week caring for the horses. Accordingly, we find that significant time and effort was expended by the couple in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs.
Petitioners argue that a profit objective is evident from the fact that they expected assets used in the breeding endeavor to appreciate. Although there were mixed motives for their move to Texas, we find that petitioners purchased the AM Ranch for the purpose of breeding, raising, and selling horses. Thus the holding of the land and the horse-related activities are considered a single activity for purposes of determining the expected appreciation of value of assets under section 1.183-2(b)(4), Income Tax Regs.Engdahl v. Commissioner, 72 T.C. 659 (1979). A taxpayer may intend, despite the lack of profit from current operations, that an overall profit will result when appreciation in the value of land used in the activity is realized because income from the activity together with the appreciation of land will exceed expenses of operation. *617 Sec. 1.183-2(b)(4), Income Tax Regs.
In this case, petitioners presented evidence showing that the current value of their 11 acres may be $ 64,900 ($ 5,900 per acre X 11). At the time of purchase, the land had a value of $ 2,800 per acre or $ 30,800. The $ 34,100 in potential appreciation in the land when added to the zero income from the breeding activity shows that appreciation would not exceed the $ 130,000 expenses of operation incurred in the years 1981-1986. Given the 400-percent appreciation that would have been required to offset these losses, maintaining the breeding activity for the profit inherent in the land was not reasonable. Additionally, petitioners introduced no evidence as to the fair market value of the ranch or improvements at the time of trial, the current value of their horses, or any increase in their value due to the training or showing of them. Cf. Engdahl v. Commissioner, 72 T.C. 659, 668 (1979). This lack of evidence prevents a finding that an expectation that the assets used in the horse operation would increase in value existed at the time of purchase and that such expectation explains petitioners' willingness *618 to continue to sustain losses. Engdahl v. Commissioner, supra; Allen v. Commissioner, 72 T.C. 28, 36 (1979). Although no one factor is determinative of the taxpayer's objective to make a profit, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true objective. Golanty v. Commissioner, 72 T.C. 411, 426 (1979); Jasionowski v. Commissioner, 66 T.C. 312, 322 (1976); Bessenyey v. Commissioner, 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); sec. 1.183-2(b)(6), Income Tax Regs. Moreover, while the presence of losses in the formative years of a horse breeding business is not inconsistent with an objective to achieve a later profitable level of operation, the goal must be to realize a profit from the entire operation *619 which presupposes that there will be sufficient net earnings to recoup the losses sustained in the intervening years. Bessenvey v. Commissioner, supra; Golanty v. Commissioner, supra.
During the 4 years at issue here, petitioners incurred losses in excess of $ 130,000. For the same period, they reported unrelated revenue totaling $ 1,571. Although we recognize that the tax years involved a start-up period and a period of market decline for Arabians, we do not find that the losses were incurred due to customary business risks or factors beyond the taxpayer's control. Sec. 1.183-2(b)(6), Income Tax Regs.
Petitioners made an effort to investigate the Arabian market and to develop a profit plan. They undercut this plan when they failed to replace Mosal with another stallion. Moreover, petitioners did not consistently breed the two broodmares every year as planned, and the herd increased by only two foals by 1984. The years prior to 1985 were the best years in which to make a profit from the sales of weanlings and foals. Had petitioners consistently bred Aidaliesa and Susanna (or a replacement broodmare) as *620 planned they would have had several foals aging between 1 and 3 years and could have taken advantage of this market. Revenues from such sales would have reduced some of the large losses incurred in years 1981-1984. Petitioners endeavored to cut costs after the market downturn by leasing their broodmares to third parties and by putting the herd up for sale. However, these factors alone do not convince us of petitioners' profit objective. After weighing all of the facts, we conclude that the lack of consistent breeding, and the lack of consistently high quality mares and stallions in years where it was possible to make money in the breeding business indicate that there was little likelihood that the operation would achieve an overall profit level sufficient to recoup total losses. This fact, coupled with petitioners' substantial losses indicates that the breeding activity was not engaged in for profit. Golanty v. Commissioner, supra.
The amount of occasional profits in relation to the amount of losses and to the taxpayer's investment in the activity are indicative *621 of the taxpayer's objective. Sec. 1.183-2(b)(7), Income Tax Regs. No profits were made in any year under consideration. An opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though only losses are generated. Sec. 1.183-2(b)(7), Income Tax Regs. We do not view petitioners' breeding activity as such a venture. Nor do we have facts here which suggest to us that a substantial ultimate profit could be made from the sale of one horse. See Pirnia v. Commissioner, T.C. Memo. 1989-627 (taxpayer believed that she could double or triple her investment in two horses within a year of purchasing them). Horse breeding requires a substantial start-up period which petitioners recognized since at the outset they did not expect to generate a profit until 1985. Petitioners were looking to future annual profits from the sale of both yearlings and from breeding fees: they were not investing in the horses to realize a hoped-for *622 one-time profit from sale of the animals. Moreover, given the presumed start-up period, given petitioners' failure to maintain a high quality core herd and given the eventual poor market conditions, petitioners have not convinced us that in any year under consideration there was a practical possibility that they could earn enough money from sales in a year to exceed expenses. See Canale v. Commissioner, T.C. Memo. 1989-619. We find that the lack of profits, the lack of consistent breeding, and the sizeable losses indicates that the breeding activity was not engaged in for profit. Petitioners are of moderate financial means. Nonetheless, despite the fact that they incurred out-of-pocket expenditures for the enterprise, the tax deductions generated by the breeding activity afforded them significant reductions in taxable income during years where the market was very poor and nontax incentives to remain in it were lacking. We find that these circumstances indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.
Elements of personal pleasure are also considered in determining whether the activity *623 was carried on with the objective of making a profit. Sec. 1.183-2(b)(9), Income Tax Regs. Although it is not apparent that the Harstons used the ranch or the horses for entertaining friends, other facts indicate elements of personal pleasure in the breeding activity. Mrs. Harston initially took riding lessons as a hobby; Mr. Harston had ridden horses all his life. Petitioners retained their first horse despite the fact that it was 22 years old and blind. These facts indicate that there were elements of personal pleasure in the activity. Accordingly, we find against petitioners on this criteria. Considering all of the facts and circumstances, we find that petitioners have failed to prove that their Arabian horse breeding activity was engaged in for profit. Rule 142(a). Accordingly, respondent's determination stands. 2. Additions to Tax
Respondent determined that petitioners are subject to additions to tax under section 6653(a)(1) and (2) for years 1983 through 1985 and sections 6653(a)(1)(A) and (B) for 1986. Section 6653(a)(1) and section 6653(a)(1)(A) *624 impose an addition to tax if any part of any underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) and section 6653(a)(1)(B) impose a further addition of 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed to be correct and the taxpayer has the burden of proving the determination is erroneous. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Rule 142(a). We hold that petitioners have carried the burden of showing that the addition to tax under section 6653(a) is not applicable under the circumstances of this case. Here petitioners were unable to prove that profit potential was the objective for their entrance into the Arabian horse breeding activity. However, the fact that *625 petitioners' proof was inadequate on this issue does not require us to find that the horse activity was due to negligence. We are not convinced that their actions or inactions with the activity rise to the level of "negligence or intentional disregard of rules or regulations." Cf. Van Scoyoc v. Commissioner, T.C. Memo. 1988-520, affd. 898 F.2d 149 (4th Cir. 1990). Accordingly, imposition of the negligence addition in this setting is inappropriate. Respondent also determined additions to tax pursuant to section 6661(a) for the 1984 and 1985 taxable years. Section 6661 provides for an addition when a substantial understatement occurs and where that understatement exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the return. The amount of the addition to tax under section 6661(a) is equal to 25 percent of any underpayment attributable to the substantial underpayment. Although they were not successful enough to show that they were entitled to the losses claimed, petitioners have convinced us that they had substantial authority *626 for their position. Accordingly, the section 6661 addition to tax is inapplicable. To reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. Student Attorney, University of Texas Law School Tax Clinic, Austin, Texas.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years at issue. All rule references are to the Tax Court's Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations.↩
3. Prior to trial, the parties reached an agreement on the amount of deductible casualty loss for the 1983 tax year.↩
4. Additionally, Aidaliesa's initial purchase price of $ 7,000 (some of which was arguably allocable to the unborn colt) suggests that petitioners did not expect to receive $ 10,000 for each of her offspring.↩