T.C. Memo. 1999-392

UNITED STATES TAX COURT

LEON L. ZACHMAN AND ESTATE OF IONE ZACHMAN, DECEASED,
LEON L. ZACHMAN, REPRESENTATIVE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14059-91.                    Filed December 1, 1999.

<u>John R. Koch</u>, for petitioners.

<u>Tracy A. Martinez</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>: Respondent determined the following
deficiencies, additions to tax, and penalties with respect to
petitioners' Federal income tax liabilities:

|  |  | Additions to Tax and Penalties | | |
| --- | --- | --- | --- | --- |
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B)* | Sec. 6662(a)** |
| 1987 | $5,766 | $288 | 50% of the interest due on $4,446 | -- |
| 1988 | 4,272 | 214 | -- | -- |
| 1989 | 14,766 | -- | -- | $2,477 |

    *    Sec. 6653(a)(1)(B) was repealed for 1988.
    **   Sec. 6662(a) was enacted in 1989, generally effective for returns the due date for which is after Dec. 31, 1989.

The issues for decision are:

1.   Whether Hillside Farm Co. (Hillside Farm), a putative business trust established by petitioners, should be disregarded for Federal income tax purposes because it lacks economic substance. We hold that it should.

2.   Whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a), for taxable years 1987 and 1988, and an accuracy-related penalty pursuant to section 6662(a) for taxable year 1989.[1]  We hold that they are.

### FINDINGS OF FACT

The parties have stipulated some of the facts, which are so found.  The stipulated facts and associated exhibits are incorporated by this reference.

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

Leon and Ione Zachman were married until her death in 1989. Leon Zachman is the representative of the Estate of Ione Zachman. Unless otherwise indicated, "petitioner" hereinafter refers to Leon Zachman, and "petitioners" refers to Leon Zachman and Ione Zachman. Petitioner resided in Rogers, Minnesota, when the petition was filed.

Petitioners have farmed in the Rogers area since 1949. Prior to 1983, petitioners' farm was held in Shady Elms Farm, a trust promoted by Lowell Anderson.[2] On January 26, 1983, petitioners transferred their farm real property to another trust, Walnut Leaf. In 1983, petitioner attended a meeting with other farmers to hear a presentation by James Noske and Norb Stelton about utilizing business trusts. On September 8, 1983, petitioners executed bills of sale, purporting to transfer their farm equipment and livestock to Hillside Farm. On the same date, in their capacities as trustees of Walnut Leaf, petitioners deeded their interests in the farm real property to Maplewood Co. (Maplewood). On October 4, 1983, petitioners executed a bill of sale whereby for the stated consideration of "One dollar and other good and valuable consideration" they transferred to

---

[2] On Feb. 24, 1983, Lowell Anderson was indicted by a Federal grand jury in Wyoming for conspiring to defraud the United States by selling common-law trusts which were used to evade Federal income taxes. See United States v. Tranakos, 911 F.2d 1422, 1424 (10th Cir. 1990). Lowell Anderson died while the criminal proceedings were pending. See id.

Maplewood two life insurance policies and an extensive assortment of personal property, including furniture, china, lamps, home appliances, a popcorn pumper, and a "Blue Madonna picture".

Hillside Farm and Maplewood both purport to be business trusts formed pursuant to Minnesota law. The named trustees of each of these trusts are Parnell, Inc. (Parnell) and Armageddon, Inc. (Armageddon), nonprofit corporations organized under the laws of South Dakota. These corporations are also the named trustees for numerous other business trusts.

The Declaration of Trust of Hillside Farm (the Declaration of Trust), dated April 25, 1983, recites that it is made between Parnell and Armageddon, "herein referred to as Trustees, for the purpose of enabling the Trustees to hold and manage the trust estate and to carry on business as hereinafter provided." The Declaration of Trust further provides in pertinent part:

ARTICLE III.  SHARES

SECTION 1.  The beneficial interest in this trust shall be divided into shares without par value.  Upon unanimous approval of the Board of Trustees, shares may be sold or exchanged for such consideration, and on such terms, as the Trustees deem proper.  All shares shall be evidenced by trust certificates of which [sic] shall be signed by each of the Trustees.

SECTION 2. The certificates shall entitle owners thereof to participate proportionately in all dividends and other distributions of income or principal as the Trustees may, from time to time, in their absolute discretion, declare and pay out; provided that, upon the termination of the trust, the Trustees shall distribute all of the property and accrued income to the certificate holders of record in

proportion that the number of shares they own bears to the total number of shares issued and outstanding.

SECTION 3.  Any Trustee hereunder may acquire, hold and dispose of shares in this Trust to the same extent and in the same way as if he were not a Trustee and without affecting in any way his status or power as such.

SECTION 4.  No shares shall be issued in addition to those originally specified herein except as replacements for other certificate holders as authorized by this Declaration. The total number of shares outstanding shall not exceed 100 (one hundred) in number.

SECTION 5.  Transfers of shares shall be made only on the books of the business trust and the old certificate properly endorsed shall be surrendered and canceled before a new certificate is issued, provided that, no transfer shall be effective until approved by unanimous vote of the Board of Trustees.

*       *       *       *       *       *       *

SECTION 7.   The rights of trust certificate holders and other persons becoming entitled to shares of the trust shall be subject to all terms and conditions of this Declaration of Trust.  The shares shall not be personal property, and the ownership thereof shall not give any person any legal or equitable title in or to the trust property or any part thereof, but shall only entitle the owners of shares to their proportionate shares of dividends and distributions as herein provided.  No shareholders shall have any rights to manage or control the property, affairs, or business of the trust, or any power to control Trustees in these respects.   No shareholder shall have any right to a partition of the trust property or to an accounting during the continuance of the trust.  No part of the trust property or the income therefrom shall be liable for the debts of any trust certificate holder and no certificate holder shall have any power to sell, assign, transfer, encumber, or in any manner to anticipate or dispose of his shares or the income produced thereby, prior to the actual distribution in fact, by the Trustee to said certificate holder.

SECTION 8.  The death, insolvency or incapacity of any trust certificate holder shall not operate to terminate or dissolve the trust or affect its continuity * * *.  If any

certificate holder hereunder dies, becomes insolvent or is placed under any legal incapacity before the termination of this trust, his shares shall become null and void and shall immediately revert to the Board of Trustees, who shall thereupon name a replacement beneficiary or beneficiaries and issue a new certificate or certificates as provided in this Declaration.

ARTICLE IV.  BOARD OF TRUSTEES

SECTION 1.  The business and property of the business trust shall be managed by Board of Trustees, who shall be the persons named in the Declaration of Trust, who shall serve until their successors are duly qualified.  In the event of the death, incapacity, resignation or retirement of any Trustee, a successor Trustee shall be appointed by the remaining Trustee or Trustees.

*     *     *     *     *     *     *

SECTION 3.  The Trustees shall hold, in the trust name, legal and equitable title to all property, real and personal, and shall have absolute and exclusive power and control over the management and conduct of the business of the trust free from any right of control of any of the certificate holders.  The Trustees may hold, manage and dispose of the property and business of the trust in the same manner as if they were absolute proprietors thereof, subject only to the specific limitations herein contained. The Trustees shall have the power, without limitation, to purchase or otherwise acquire property, and to sell, exchange, lease, mortgage, pledge or in any manner dispose, encumber, improve or deal with the property of the trust, real or personal, or any part thereof, or any interest therein, on such terms and for such consideration as they deem proper. * * *

The Declaration of Trust, as well as various minutes for the board meetings of its trustees, bears the signatures of Cheryl A. Foshaug, president of Armageddon, and Marti Inman, president of Parnell.  Neither Foshaug nor Inman has ever met petitioners or heard of Hillside Farm.  Neither ever managed Hillside Farm.

They each signed various papers, including blank or incomplete pages, at the request of James or Joan Noske. Foshaug often neither read nor understood the pieces of paper she signed. As president of Parnell, Inman took no action other than as directed by James or Joan Noske.[3]

The minutes for the Hillside Farm trustees' meeting dated September 8, 1983, signed by Foshaug and Inman, indicate that the trustees appointed Daniel Strohmeier as manager of Hillside Farm, with authority to oversee the business operations of the trust and to issue checks to pay general operating expenses.[4] If Strohmeier ever conducted business related to Hillside Farm, it was at the direction and under the control of James or Joan Noske.

---

[3] On June 14, 1985, the U.S. District Court for the District of Minnesota entered a final judgment of permanent injunction as to Foshaug, Inman, Armageddon, and Parnell, enjoining them under secs. 7402 and 7408 from organizing or assisting in the organization of an abusive tax shelter plan or arrangement involving business trusts.

[4] Another case involving Noske trusts, Scherping v. Commissioner, T.C. Memo. 1989-678, includes as a finding of fact that in June 1983 James and Joan Noske took Strohmeier from an alcoholic treatment center, made him a figurehead president of an entity to which the taxpayers had transferred their dairy farm assets, and placed him on the taxpayers' family farm to live and work for the last half of 1983, doing farm chores at the taxpayers' direction.

Sometime in 1987 or 1988, John B. Ellering became president of Armageddon and Parnell, and replaced Strohmeier as manager of Hillside Farm.[5]

Petitioners had no official titles or offices in Hillside Farm, Armageddon, or Parnell. Initially, petitioners received all 100 trust shares in Hillside Farm. On December 29, 1983, petitioners surrendered their original 100 shares in Hillside Farm, each receiving 20 new shares. The remaining 60 shares purportedly were transferred to BBCA, Inc. (BBCA), an organization purporting to be a church.[6] The president of BBCA was Joan Noske.

Several years before the creation of Hillside Farm, petitioner had curtailed his work on the farm because of health

---

[5] In Sept. 1995, Ellering was convicted by a jury in the U.S. District Court for the District of Minnesota of conspiracy to defraud the United States by impeding the Internal Revenue Service. His conviction was based on his participation with James and Joan Noske and Imelda Spaeth in a scheme to assist clients of the Noskes, who sought to reduce or avoid Federal income taxes, form business trusts that named Armageddon and Parnell as trustees.

After Ellering's criminal conviction, petitioners' cousin Gerard became president of Armageddon and Parnell, and petitioners' son Dale became managing director of Hillside Farm.

[6] The minutes of a special meeting of the Hillside Farm trustees, dated Dec. 29, 1983, and signed by Inman and Foshaug, recite that these transfers were made upon application of the petitioners and were unanimously approved by the trustees.

problems. During the years at issue, his work on the farm consisted largely of riding a tractor or baling hay no more than a few times a week. Ione Zachman did not participate in the farm work, apart from growing her own garden. Both before and after the creation of Hillside Farm, petitioners' sons, Dale and Paul, performed most of the farm work. Dale made most of the farming decisions. Dale and Paul each received weekly wages for their labors.

All the gross receipts from petitioners' farming operation were sent to Joan Noske at a post office box in Cold Springs, Minnesota. Joan Noske generally made provision out of "Hillside Farm" funds for paying farm expenses, as well as certain of petitioners' personal expenses, including insurance, medical bills, income taxes, and property taxes on petitioners' residence.

During the years at issue, Joan Noske did all the bookkeeping for Hillside Farm. She prepared the Federal income tax returns for Hillside Farm and at least 20 other trusts that name Armageddon and Parnell as trustees. She also prepared petitioners' Federal income tax returns for the years in issue. At least twice a year, petitioners received ledgers from Joan Noske which accounted for funds purportedly received and disbursed by Hillside Farm during the years at issue. The

disbursements included $125 per month to Joan Noske for her bookkeeping services.

On November 16, 1985, the U.S. District Court for the District of Minnesota entered a Final Judgment of Permanent Injunction as to James and Joan Noske, finding that they had engaged in conduct subject to penalty under section 6700 and enjoining them from organizing, assisting, selling, or otherwise promoting business trusts as abusive tax shelters. As part of the judgment, the Noskes were ordered to supply respondent's District Director with the names and addresses of all purchasers of the 186 business trusts on file with the Minnesota Secretary of State which list Armageddon and Parnell as corporate trustees. Subsequently, the Noskes identified Hillside Farm and Maplewood as being among the business trusts involved in the injunction action.

In September 1995, Joan and James Noske were convicted of, among other things, conspiracy to defraud the United States by impeding the Internal Revenue Service, and conspiracy to evade Federal income taxes. The convictions were based on the Noskes' participation in a scheme to assist their clients in reducing or avoiding Federal income taxes by forming business trusts which named Armageddon and Parnell as trustees. It was further determined that the Noskes participated in a scheme whereby their clients would transfer all of their income-producing property to

the business trusts and then issue 60 percent of their trust shares to BBCA, thus effectively evading the assessment and payment of 60 percent of their clients' Federal income tax liability.

Hillside Farm filed Federal income tax returns for 1987 through 1989 reporting Schedule F income from petitioners' farming operation.  During the years at issue, Hillside Farm reported that 40 percent of its net income was distributed to petitioners.[7]  The trust itself paid no taxes.

Respondent determined that petitioners are taxable on Hillside Farm's gross income because the creation of Hillside Farm and the subsequent transfer of petitioners' assets thereto was a sham transaction lacking in economic substance, because petitioners have improperly attempted to assign their income to Hillside Farm, and because petitioners are taxable on the trust income under the grantor trust rules in sections 671 through 678.

## OPINION

If the creation of a trust has no real economic effect and alters no cognizable economic relationships, it will be disregarded for Federal income tax purposes; our guidepost is the economic substance of the transaction.  See Zmuda v.

_____

[7] Hillside Farm claimed an income distribution deduction for 100 percent of its reported distributable net income, but it failed to report the recipient of the remaining 60 percent of its net income.

Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980). This rule applies even if the trust is recognized pursuant to State law as a business trust or other form of jural entity. See Zmuda v. Commissioner, supra.[8]

Whether a trust lacks economic substance is a question of fact. See Paulson v. Commissioner, 992 F.2d 789, 790 (8th Cir. 1993), affg. per curiam T.C. Memo. 1991-508. Relevant factors include whether the taxpayer's relationship as grantor to the property differed materially before and after the trust's formation, whether the trust had an independent trustee, whether an economic interest passed to other beneficiaries of the trust, and whether the taxpayer felt bound by any restrictions imposed by the trust or by the law of trusts. See Markosian v. Commissioner, supra at 1243-1245; Muhich v. Commissioner, T.C. Memo. 1999-192. The burden of proof is on petitioners. See Rule 142.

_____

[8] This is not the first occasion we have had to examine trust arrangements devised and promoted by the Noskes. On each occasion, we determined that they were sham entities used by taxpayers to avoid income tax. See, e.g., Scherping v. Commissioner, T.C. Memo. 1998-288; Paulson v. Commissioner, T.C. Memo. 1991-643, affd. without published opinion 994 F.2d 843 (8th Cir. 1993); Paulson v. Commissioner, T.C. Memo. 1991-508, affd. 992 F.2d 789 (8th Cir. 1993); Scherping v. Commissioner, T.C. Memo. 1991-384; Chase v. Commissioner, T.C. Memo. 1990-615; Chase v. Commissioner, T.C. Memo. 1990-164, affd. 926 F.2d 737 (8th Cir. 1991); Scherping v. Commissioner, T.C. Memo. 1989-678.

The evidence clearly establishes that Hillside Farm lacked economic substance and was merely a paper entity created for the primary purpose of reducing petitioners' Federal income tax. Petitioners' relationship to their property did not differ materially before and after the creation of Hillside Farm. Although petitioners purported to transfer all their income-producing personal property to Hillside Farm, in reality they retained dominion and control over it, with their sons providing most of the labor in return for weekly wages.

The record does not establish that Parnell and Armageddon were independent trustees or that they performed any significant duties or exercised any significant control or power over the farm. Contrary to the terms of Article IV, Section 3, of the Declaration of Trust, Parnell and Armageddon did not have "absolute and exclusive power and control over the management and conduct of the business". Petitioners concede that Inman and Foshaug were strangers to Hillside Farm and were nothing more than figurehead presidents of the corporate trustees, merely signing documents, often blank or incomplete, at the instigation of the Noskes. The use of strangers as signers of organizational documents and the absence of any meaningful role by nominal trustees in the operation of the trust are evidence that the purported trust lacks economic substance. See Para Techs. Trust v. Commissioner, T.C. Memo. 1994-366, affd. without published

opinion sub nom. <u>Anderson v. Commissioner</u>, 106 F.3d 406 (9th Cir. 1997), and cases cited therein.

Petitioners also concede that Strohmeier served no meaningful function as "manager" of Hillside Farm. Similarly, there is no evidence that Strohmeier's successor, Ellering, served any meaningful function as manager of Hillside Farm.[9] In fact, there is no evidence that Hillside Farm ever conducted any business at all.[10]

Upon the alleged creation of Hillside Farm, no economic interest passed to any beneficiary other than petitioners. Nor does the record establish that the subsequent purported transfer

---

[9] Petitioner testified that Ellering made "some" decisions about farm activities, but he was unable to offer specific examples, stating that "we just talked about the weather, and see what would be the best thing to do." He testified that his sons, rather than Ellering, made all decisions about when to plant crops, cut hay, and such. Dale Zachman testified that there had been instances when the purchase of new farm machinery had been "delayed" for Ellering's approval, but when questioned he could not recall a specific instance.

[10] On brief, petitioners seek to attribute to Parnell and Armageddon the activities of the Noskes, arguing that Parnell and Armageddon controlled Hillside Farm's "checkbook" through the agency of the Noskes. Petitioners have not established, however, that the Noskes were in fact the agents of Parnell or Armageddon. There is no mention of the Noskes in the Declaration of Trust. There is no evidence that the Noskes were authorized to or actually did assume the fiduciary duties allegedly imposed on the corporate trustees under the purported trust documents. Rather, the totality of the evidence strongly suggests that the Noskes provided petitioners with bookkeeping services, for which they were compensated, and bad advice as part of a conspiracy to defraud the United States, for which they were imprisoned.

to BBCA of 60 percent of petitioners' shares in Hillside Farm was a valid conveyance of petitioners' economic interests. To the contrary, at trial petitioner vigorously asserted that he never knowingly authorized or intended any such transfer of shares to BBCA. Similarly, on brief petitioners argue that "there were no valid transfers to BBCA".

Petitioners argue that Hillside Farm was created for estate-planning purposes to keep the farm together in the family. It is unclear, however, how the establishment of Hillside Farm would accomplish any such objective. Under Article III, Section 8 of the Declaration of Trust, if any trust certificate holder dies before termination of the trust, his shares become "null and void and shall immediately revert to the Board of Trustees, who shall thereupon name a replacement beneficiary or beneficiaries". Accordingly, the creation of Hillside Farm would have provided petitioners no assurance that the farm would remain in their family. To the contrary, under the terms of the Declaration of Trust, absolute power over the disposition of the farm property, either during their lives or upon the death of either petitioner, would have resided with Parnell and Armageddon. In any event, the expectancy of an estate-planning advantage does not establish

entitlement to an income tax advantage. See <u>Prindle Intl. Marketing, UBO v. Commissioner</u>, T.C. Memo. 1998-164.[11]

Contending that they received only a share of the Hillside Farm income, petitioners argue that they should be taxed only on the share they actually received.[12] It is axiomatic, however, that taxation is concerned with "actual command over the property taxed--the actual benefit for which the tax is paid" and that the transfer of formal legal title will not operate to "shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred." <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 573 (1978); see <u>Sundance Ranches, Inc. v. Commissioner</u>, T.C. Memo. 1988-535, affd. without published opinion (9th Cir. 1990). Petitioners clearly retained sufficient power and control over the farm to be properly treated as the recipients of the income

[11] On brief, petitioners also argue that creation of the Hillside Farm allowed petitioner to qualify for Social Security without reduction for personal service income. The record is devoid of evidence regarding any such purpose. In any event, that petitioners may have wished to evade earned income restrictions for Social Security purposes scarcely bolsters their case for recognizing the trust for Federal income tax purposes.

[12] The record does not establish what ultimately happened to the 60 percent of Hillside Farm income allegedly distributed to BBCA. Cf. <u>United States v. Klaphake</u>, 64 F.3d 435 (8th Cir. 1995) (in a case involving the transfer of a family farm business to a Noske trust of which BBCA was a beneficiary, the taxpayers received cash back from BBCA on a regular basis).

for tax purposes.  Cf. <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 604 (1948); <u>Hutcherson v. Commissioner</u>, T.C. Memo. 1984-165.

In light of our holdings on these issues, we need not reach respondent's alternative argument that petitioners should be taxed on the Hillside Farm income under the grantor trust rules.

<u>Additions to Tax and Penalties</u>

Respondent determined that petitioners are liable for additions to tax under section 6653(a) for taxable years 1987 and 1988, and an accuracy-related penalty under section 6662 for taxable year 1989.  Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence.  Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence.  Section 6662(a) imposes a 20-percent penalty on any portion of an underpayment that is attributable to negligence.  Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the same circumstances.  See <u>Neely v. Commissioner</u>, 85 T.C. 934 (1985).  Petitioners have the burden of proving that respondent's determinations are incorrect.  See Rule 142(a); <u>Bixby v. Commissioner</u>, 58 T.C. 757, 791-792 (1972).

Petitioners argue only that because there is no underpayment of tax, there is no amount upon which to compute additions to tax

or penalties. We have sustained respondent's determination that petitioners understated their Federal income tax liability for taxable years 1987, 1988, and 1989. Accordingly, petitioners' argument must fail.

Petitioners have not established that they used reasonable care in ascertaining their income tax liability for these years. They have not shown that they reasonably relied on a competent professional adviser independent of those persons who were involved in marketing these abusive trusts. We sustain respondent's determinations on this issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.